**WADENA IMPLEMENT COMPANY,**
**et al., Respondents,**

v.

**DEERE & COMPANY, INC., Appellant,**

**Darrell Payne, Defendant.**

**Nos. C5–91–975, C7–91–1402.**

Court of Appeals of Minnesota.

Jan. 28, 1992.

Review Denied March 26, 1992.

J. Michael Dady, Joseph A. Thomson, Lindquist & Vennum, Minneapolis, for respondents.

Louise A. Dovre, Richard J. Nygaard, John M. Bjorkman, Rider, Bennett, Egan & Arundel, Minneapolis, for appellant.

Considered and decided by DAVIES, P.J., and PETERSON and FOLEY,* JJ.

## OPINION

DAVIES, Judge.

Appellant Deere & Co. challenges (1) the trial court's finding that appellant violated the Minnesota Agricultural Equipment Dealership Act through improper termination of respondents' dealership; (2) the court's grant of a permanent injunction; and (3) the court's award of attorney fees. We affirm.

## FACTS

Respondent Wadena Implement Company (Wadena Implement) has been a farm equipment dealership for appellant Deere & Company (Deere) since 1959. Respondent Steven Nelson is the majority shareholder and vice president of Wadena Implement. Wadena Implement's business rela-

tionship with Deere is governed by a written dealer agreement.

Deere provides each of its dealers with a trade area, commonly referred to as the dealer's Area of Responsibility (AOR), which represents the area from which the dealer should draw customers. Wadena Implement's AOR includes parts of Cass, Ottertail, Todd, and Wadena Counties. Deere continuously evaluates and reviews its dealers based upon their sales performance within their AOR. As part of the evaluation process, Deere annually reviews its dealers and prepares for each a written Dealer Business Review, Dealer Marketing Objective, and Individual Action Plan.

In 1987, Deere began using weighted market share data developed to evaluate more accurately its dealers' performance. Wadena Implement's market share for 1987 was 8.6 percent, while other Deere dealers in Territory 24 averaged 31.9 percent and in Division II averaged 34.9 percent. In 1988, Wadena Implement's market share dropped to 8.1 percent, while the corresponding territory and division averages increased to 44.5 percent and 47.9 percent, respectively. During Wadena Implement's annual review in December 1988, Deere informed Nelson that he needed to increase his market share to between 16 and 20 percent of the market.

Deere sent Nelson a letter dated January 27, 1989, stating:

> Your 8.6% agricultural market share * * * for the 1987 year, is totally unacceptable to us * * *. [I]f you do not achieve significant progress towards achieving market share levels at your Wadena dealership comparable to average market share levels [in Territory 24 and Division II] during 1989, we will reassess our position regarding a continuing business relationship with you.

On March 8, 1989, Nelson met with five Deere managers, at their request, to discuss his sales performance. The managers said they intended to review the 1989 sales figures and, unless Wadena Implement's

* Retired judge of the Court of Appeals, acting by appointment pursuant to Minn. Const. art. VI, § 2.

share improved to the territory average, "different action" would be taken. Deere confirmed the substance of this meeting in a letter to Nelson dated March 9, 1989. The letter did not mention specific consequences to Wadena Implement if the territory average market share goal was not met.

During Wadena Implement's annual business review on January 9, 1990, Deere told Nelson that he needed to increase Wadena Implement's market share to between 20 and 30 percent. The annual business review form, dated January 9, 1990, states:

> If Steve is to remain a JD dealer his market share has to increase sizeably above 8.1%. He is aware of this increase through a meeting [the managers] had with Steve last March 89.

The review form also indicates that ownership of the dealership would not continue for five years unless the market shares moved up from 8.1 percent to close to the territory average. A copy of the Business Review and Action Plan was provided to Wadena Implement. At the time of the review, 1989 market share information was not yet available.

In July 1990, Deere's 1989 market share data became available and revealed that Wadena Implement had improved its standing by 75 percent, to 14.3 percent of the market. This was still well below the territory and division averages, however, and in early August 1990, Deere made the final decision to terminate Wadena Implement, effective March 1, 1991.

This decision was communicated in an August 10, 1990, letter to Nelson. The letter provided Wadena Implement with the 180 days' notice required under the Dealer Agreement and also allowed Wadena Implement 60 days to cure the deficiencies for which it was being terminated, as required by the Minnesota Agricultural Equipment Dealership Act.

Wadena Implement filed this action on February 5, 1991, seeking injunctive relief damages based on Deere's alleged breach of contractual and common law obligations, as well as Deere's alleged violation of the Minnesota Agricultural Equipment Dealership Act. The trial court granted Wadena Implement's motion for summary judgment and ordered that Deere be permanently enjoined from using Wadena Implement's failure to achieve adequate market penetration in 1989 as a basis upon which to terminate the Dealership Agreement.

## ISSUES

1. Did the trial court err in finding that appellant violated the Minnesota Agricultural Equipment Dealership Act through improper termination of respondents' dealership?

2. Did the trial court err in granting to respondents a permanent injunction?

3. Did the trial court err in awarding attorney fees to respondents?

## ANALYSIS

On review of a summary judgment, this court must determine whether any genuine issues of material fact are disputed and whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979). An appellate court is not bound by the trial court's application of the law to any undisputed facts. *A.J. Chromy Constr. Co. v. Commercial Mechanical Serv., Inc.*, 260 N.W.2d 579, 582 (Minn. 1977).

### I.

The Minnesota Agricultural Equipment Dealership Act (MAEDA) provides that a farm equipment manufacturer may terminate a dealership agreement if it has "good cause." Minn.Stat. § 325E.062, subd. 1 (1990). The MAEDA defines "good cause" as:

> [F]ailure by a farm equipment dealer to substantially comply with essential and reasonable requirements imposed upon the dealer by the dealership agreement, if the requirements are not different from those requirements imposed on other similarly-situated dealers by their terms.

*Id.* In addition to this general definition, the MAEDA enumerates eight other situations in which a manufacturer would have the requisite "good cause," including where:

> [T]he farm equipment dealer, after receiving notice from the manufacturer of its requirements for reasonable market penetration based on the manufacturer's experience in other comparable marketing areas, consistently fails to meet the manufacturer's market penetration requirements.

*Id.* at subd. 1(8).

The trial court, in granting summary judgment, concluded that Deere had violated the MAEDA in five ways.[1] This court agrees with the trial court's grant of summary judgment based on three of its conclusions: (a) as a matter of law the market share requirement was *not communicated* by Deere to respondents in a way or at a time so as to make the requirement a reasonable term of the dealership agreement; (b) as a matter of law Deere *cannot establish consistent failure* by respondents to meet any market share requirements imposed by Deere; and (c) Deere's *notice was defective* in a practical way because the steps the dealer was required to take to rectify the deficiency were impossible to meet and thus were unreasonable as a matter of law. These three shortcomings in Deere's process of terminating Wadena Im-

plement violate the MAEDA. We need not address the other two grounds for summary judgment.

## A. *Failure to Communicate*

■ The MAEDA allows a manufacturer to use market share data as criteria for measuring a dealer's performance,[2] *see* Minn.Stat. § 325E.062, subd. 1. But Deere's standardized Dealer Agreement did not include reference to any market share obligations until the October 26, 1989, amendment, which did not take effect until May 1, 1990. Also, it was not until the letters sent to Wadena Implement in January and March of 1989 that Deere included specific references to a "requirement" that the dealership achieve a market share level "comparable" to the division and territory averages. Thus, 1989 is the first year in which Wadena Implement could be found to have had notice that specific market share averages were being used by Deere as a performance requirement.

We agree with the trial court's conclusion that:

> If a specific market share is to be required for a particular year, elementary notions of fairness would dictate that the dealer unambiguously be informed of the requirement *before* the year begins. * * * [T]he communication came too late to be reasonable.

**1.** The court concluded:
First, that John Deere did not establish a *requirement* that Wadena Implement achieve Territory or Division II averages for * * * market share in 1989; second, that if an essential market share requirement was imposed by Deere for 1989, it did not exceed 16–20%; third, if Deere intended to impose a requirement that Wadena Implement achieve Territory or Division II averages for market share in 1989, that requirement was not communicated by Deere in a way or at a time so as to make imposition of the requirement both an *essential* and *reasonable* term of the dealership agreement; fourth, that Deere cannot establish that Wadena Implement "consistently failed" to meet any market share requirements imposed by Deere. * * * The fifth critical finding is drawn from the first four * * *. [T]he notice that Deere sent out was defective because the "notice was wholly inadequate in a practical sense," and because "the steps that [the dealer] was required to

take to rectify the deficiency were impossible for [the dealer] to meet and thus were unreasonable."
(Emphasis in original; citation omitted.)

**2.** Case law interpreting a nearly identical Wisconsin statute has found that market share goals, in general, are a permissible dealership requirement. *See Al Bishop Agency, Inc. v. Lithonia–Division of Nat'l Serv. Indus., Inc.,* 474 F.Supp. 828, 834 (E.D.Wis.1979) (manufacturer's requirement that dealer meet market penetration goals is reasonable and nondiscriminatory in general); *L–O Distributors, Inc. v. Speed Queen Co.,* 611 F.Supp. 1569, 1580 (D.Minn. 1985) ("[T]he WFDL is intended to prevent the arbitrary and capricious termination of dealerships, and not to afford tenure to nonproductive dealers. * * * [G]rantors may terminate dealerships that fail to achieve reasonable sales goals.").

■ Further, for a newly imposed market share requirement to be reasonable, the dealer must have at least some realistic prospect of achieving the level required within the time permitted. If the termination letter is taken at face value, Wadena Implement was terminated for failing to increase its market share by 500 percent in one year (1989). For a 30–year–old dealership such a requirement is unreasonable on its face.

## B. *The "Consistently Fails" Standard*

■ The MAEDA specifically states that "good cause" termination for failure to achieve a stated market share goal is permissible only if the dealer *"consistently fails* to meet the manufacturer's market penetration requirements." Minn.Stat. § 325E.062, subd. 1(8) (emphasis added). We agree with the trial court that market share requirements must be set at periodic intervals, and the dealer's failure to reach those required market share levels must occur over a number of intervals before the "consistently fails" standard for termination can be met.

■ Because Deere compiles its market share data on an annual basis, Deere would have to show at a minimum that Wadena Implement substantially failed to comply with its market share requirements two years in a row. Because 1989 was the first year for which a specific market share requirement could be inferred, and because at least two years of non-compliance must be present for consistent failure to be found, Deere, on the facts presented, could not meet its burden of proof that Wadena Implement consistently failed to meet its reasonable market share requirements.

## C. *Defective Notice for Cure*

■ Deere sent its notice of termination because of Wadena Implement's alleged failure to reach 1989 market share requirements. The first problem with the termination notice is that it was not sent until August 1990. Obviously Wadena Implement could not go back and improve its sales records for 1989 after-the-fact. Deere provided no information as to what actions Wadena Implement needed to take to "cure" problems with 1989 sales.

Second, if Deere intended to use 1990 market share performance to measure Wadena Implement's efforts to cure, Deere would need to wait until July of 1991 to make its final termination decision; Deere does not possess reliable market share performance data for a year until July of the following year. Yet the termination was to take effect March 1, 1991, which did not allow either party the opportunity to review the 1990 data.

Finally, since market share performance is measured annually, a dealer logically should be entitled to a full year's time in which to comply with reasonable market share requirements.[3]

Thus, although Deere's August 10, 1990, termination letter technically complies with the notice requirements in both the MAEDA and the Dealer Agreement, it violates the MAEDA by virtue of its ambiguity and the practical impossibility of compliance.

We find that Deere violated the MAEDA's termination provision, as a matter of law, through the unreasonableness of the time allowed and the manner in which Deere imposed its market penetration requirement upon Wadena Implement, and the manner in which it terminated the dealership.

## II.

Deere also appeals the grant of injunctive relief to Wadena Implement, arguing that the trial court erred in failing to hold an evidentiary hearing to analyze the legal requirements for such relief.

■ The decision whether to grant injunctive relief rests within the trial court's discretion. *Cherne Indus., Inc. v. Grounds & Assoc., Inc.,* 278 N.W.2d 81, 91 (Minn.1979). It is error, however, for the trial court to grant injunctive relief without

**3.** *See Al Bishop Agency,* 474 F.Supp. at 834 (termination notice was inadequate in practical sense, and it was impossible ever to have complied with the cure requirements), interpreting similar notice requirements in the Wisconsin Fair Dealership Law.

evaluating specific factors.[4] *M.G.M. Liquor Warehouse Int'l, Inc. v. Forsland,* 371 N.W.2d 75, 77 (Minn.App.1985).

■ On the other hand, where injunctive relief is explicitly authorized by statute, as it is here under Minn.Stat. § 325E.065 (1990), proper exercise of discretion requires the issuance of an injunction if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purposes behind the statute's enactment. *United States v. White,* 769 F.2d 511, 515 (8th Cir.1985).

■ In a manner similar to *White,* where the court combined the injunction hearing with the trial, the trial court here combined the injunction and summary judgment hearings, providing the opportunity for consideration of relevant factors. Further, because the MAEDA explicitly provides for injunctive relief where a violation has occurred, the trial court's injunctive relief is appropriate.

### III.

■ The remaining issue is whether the trial court erred in awarding respondents their attorney fees and costs as part of this litigation. The MAEDA includes the following clause:

> If a farm equipment manufacturer violates sections 325E.061 to 325E.065, a farm equipment dealer may bring an action against the manufacturer * * * for damages sustained by the dealer as a consequence of the manufacturer's violation, together with the actual costs of the action, including reasonable attorney's fees.

Minn.Stat. § 325E.065.

The statutory language clearly gives respondents a right to seek fees as part of their remedy for Deere's violation of the MAEDA. In interpreting the similar Wisconsin Fair Dealership Law (WFDL), the Wisconsin Court of Appeals held that the

only prerequisite to recovery of reasonable attorney fees is success in the action. *Lindevig v. Dairy Equipment Co.,* 150 Wis.2d 731, 742, 442 N.W.2d 504, 508 (Wis.App. 1989). In another recent case, the Wisconsin court held that the manufacturer's decision to abandon termination proceedings did not prevent the award of attorney fees because the dealer has an express statutory right to such fees under the WFDL. *Siegel v. Leer, Inc.,* 156 Wis.2d 621, 629–32, 457 N.W.2d 533, 536–38 (Wis.App.1990).

Liability under the MAEDA is established when a manufacturer terminates a dealer without the required "good cause" or sufficient notice and opportunity to cure. Wadena Implement was successful in its action against Deere, which was found to have violated the statute. Therefore, it was not an abuse of discretion for the court to have awarded attorney fees to respondents.

### DECISION

A manufacturer's termination of a dealership agreement violates the Minnesota Agricultural Equipment Dealership Act when the manufacturer fails to communicate clearly the specific market share requirements being imposed on the dealer, where the manufacturer fails to show that the dealer consistently failed to meet those requirements, and where the termination notice and cure provisions are ambiguous and impossible to achieve. Injunctive relief is proper where it is explicitly authorized by statute and where the trial court has had an opportunity to consider all relevant factors. A dealership may be awarded attorney fees under the Minnesota Agricultural Equipment Dealership Act where it has proven a violation of the Act by the manufacturer.

Affirmed.

---

**4.** These factors traditionally include the relationship between the parties, the harm to plaintiff if injunctive relief is denied as compared to the harm to defendant if it is granted, plaintiff's likelihood of success on the merits, and, any

public interest or public policy that may be involved. *See Dahlberg Bros., Inc. v. Ford Motor Co.,* 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (Minn.1965).