**HECK IMPLEMENT, INC., Plaintiff,**

v.

**DEERE & COMPANY, Defendant.**

**No. 96–6032–CV–SJ–6.**

United States District Court,
W.D. Missouri,
St. Joseph Division.

May 7, 1996.

Robert J. Bjerg, Seigfreid, Bingham, Levy, Selzer & Gee, Kansas City, MO, J. Michael Dady, Lindquist & Vennum, Minneapolis, MN, Jeffrey S. Haff, J. Michael Dady & Assoc., Minneapolis, MN, for Heck Implement, Inc.

Daniel M. Dibble, Timothy K. McNamara, Lathrop & Gage L.C., Kansas City, MO, for Deere & Company.

### MEMORANDUM AND ORDER

SACHS, District Judge.

Plaintiff (Heck) has been a dealer in agricultural implements by agreement with the defendant supplier (Deere) since 1982. The current agreement was signed in 1985. It covers Holt County, Missouri, as well as the Southern portion of Atchison County and the Western portion of Andrew County. Other Deere dealers from outside the territory (the AOR) also sell in Heck's territory, which contains rich Missouri River bottom-land where large implements are typically purchased. Tractors and combines are the major items sold. Heck also sells used equipment, frequently obtained from trade-ins, and has a profitable servicing and parts department. Heck's business is located in Mound City. It is a comparatively small, family-owned organization.

This proceeding challenges Deere's proposed termination of the Heck dealership, pursuant to a 180–day notice delivered to Heck in September 1995, culminating a long-standing complaint that Heck's market share in its territory is inadequate.

A temporary restraining order was entered by agreement. Ruling is here made on a preliminary injunction motion, based on a two-day hearing that was completed last week.

Various contentions are made by the parties; however, both sides concentrate attention on whether there has been compliance with the eighth "good cause" provision of § 407.840, RSMo, protecting farm implement dealers from arbitrary or unreasonable terminations, as defined by the Missouri General Assembly. Subparagraph 8 provides that good cause for termination shall exist whenever:

(8) The farm equipment dealer has *consistently* failed to meet the manufacturer's *requirements* for *reasonable market penetration* based on the manufacturer's experience in other *comparable* marketing areas. (emphasis added).

Heck's market penetration since 1988 in its territory, as compared with sales of Deere's competitors and dealers operating from outside the territory, topped out at 31% in 1988 and 32% in 1993, but otherwise has ranged from 12.8% in 1994 to 15% in 1992, counting only the full calendar years for which records have been made. Pl.Exh. 5. During the same years, Deere's market penetration in the multi-county division which includes Northwest Missouri ranged from a high of 47.7% in 1993 to a low of 34.6% in 1988. The dealer average penetration within a 100 mile radius ranged from a high of 49.87% in 1993 to a low of 37% in 1992. Except for 1993, therefore, in recent years Heck's market penetration has been less than half the average and less than half the district's performance as a whole.[1]

Heck's explanation of its modest market penetration in its territory is that the rich potential for sales has attracted Deere dealers from outside the territory, which allegedly offer more favorable "deals" to prospective purchasers. To the extent this explanation is valid, it may relate more to trade-in offers by nonresident competitors than to price competition itself. On the other hand, Deere has complained that Heck has failed to market new products aggressively, for example by failing to employ an additional salesperson to work the territory, as repeatedly recommended by Deere and promised by Heck. Because much of a dealer's profits relate to servicing and parts, Deere suggests that Heck has not been highly motivated to improve its market penetration on new equipment.

It would appear superficially that Deere had "good cause" for terminating Heck, as the term would be commonly understood in business circles. A more serious question, however, is whether it had "good cause," as defined by the protective statute.

■ Before considering the merits further, the court will review the various factors that must be taken into account in determining whether to issue a preliminary injunction, under standards set forth by the en banc ruling of the Court of Appeals in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir.1981). These include "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." 640 F.2d at 113.

■ Deere asserts that Heck's loss of its dealership can, if wrongful, be compensated by a damage award, that Heck will be able to remain in business as a seller of used equipment and supplier of parts and services, and that the Court of Appeals has ruled that dealership termination does not constitute irreparable harm (citing *ABA Distributors, Inc. v. Adolph Coors Co.*, 661 F.2d 712 (8th Cir.1981)).

---

1. Because Heck's sales doubled during the first eight months of 1995, it is possible an approach to the 1993 improvement was in prospect for the calendar year 1995, prior to the termination notice. Pl.Exh. 26.

*ABA Distributors* is not a strong authority for defendant. A divided panel ruled that a simple freezing of the dealership relationship would give the plaintiff benefits beyond the times guaranteed by either the agreement or the pertinent statute, and that an order to comply with procedural requirements would suffice. 661 F.2d at 715. The panel majority attempted to distinguish a Second Circuit case (*Semmes, infra*) where the dealer had held its position for a long time, where damage was " 'not measurable entirely in monetary terms,' " and the dealer wanted " 'to sell automobiles, not to live on the income from a damages award.' " 661 F.2d at 714. The present case seems more like the Second Circuit case (and many other cases involving termination of dealerships)[2] than it resembles *ABA Distributors*. Even assuming Heck's ability to limp along as a crippled former dealership, very considerable irreparable harm would occur.

Deere asserts that if a successor in Heck's territory would have average success in market penetration, there would be an increase in annual settlements in the approximate amount of $1 million. Assuming a six-month delay between entry of a preliminary injunction and denial of a permanent injunction, Deere seeks a bond to protect it from loss in the amount of not less than $500,000. There are serious flaws in these claims. First, there is no hint that a successor dealership is in the wings, and it could easily be a matter of months before a successor began operations. Such delay would result in a temporary total loss of Deere business from a Mound City base. Second, with the difficulty Heck has had in acquiring significantly more business, it seems entirely unlikely that a successor, when in place, would meet with instant success, measured by average market penetration. Third, Deere's real losses are minimized by the sales by other Deere dealers. It is entirely uncertain how the termination of a dealer with limited success as a new products seller will affect Deere's market in the Mound City area.

In my judgment, likely harm to Heck from loss of the dealership greatly outweighs any likely harm to Deere from continuing the dealership for a hypothetical six months. The urgency of Deere's needs is also belied by the many years of threatening termination, going back to 1989.

Before turning to the critical issue of likelihood of success, I note that the public interest is not a significant factor in ruling the motion, although some temporary loss of employment and disturbance of customer relations may outweigh what Deere can quickly offer the affected territory. It should also be understood that any "predetermination of the merits" must necessarily be tentative in nature; to do otherwise "would be extremely unfair and prejudicial" to the losing party. *O'Connor v. Peru State College,* 728 F.2d 1001, 1002 (8th Cir.1984). The parties may be reassured by knowing that my tentative views have shifted several times already, and the following analysis may change dramatically before final judgment.

■ The previously-quoted statutory reference to the manufacturer's "requirements" could have either of two meanings. It could simply mean, as Deere says, what we demand from a dealer, irrespective of sanctions for nonfulfillment of the demands. It could mean what the manufacturer really insists upon as a condition of continuation of the dealership. If average market penetration were treated as an unconditional "requirement" rather than a target, it would appear that Heck has consistently failed to reach that goal. Even in 1993, its market penetration of 32% was some 15 points below average for the division and almost 18 points below average for the dealerships in the 100 mile radius. If a manufacturer's "requirements" are viewed by what I called the "flunk test" at the hearing (that is, what penetration is the realistic standard for continuance of a dealership), it would seem that Deere has permitted a few dealerships to continue in effect with market penetrations below 20%. *See* Pl.Exh. 5. The 32% penetration in 1993 is far greater than Deere has used, in practice, as a requirement for continuing a dealership.

**2.** *See, e.g., Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1382–3 (6th Cir. 1995); *Associated Producers Co. v. City of Independence,* 648 F.Supp. 1255 (W.D.Mo.1986).

Judge Will once discussed this issue as it relates to auto dealers. Based on a manufacturer's conduct, he held that a "Minimum Sales Responsibility" or MSR figure had been frequently waived as a basis for termination, and should thus be treated "as a performance goal rather than as a condition of those agreements." *Madsen v. Chrysler Corporation*, 261 F.Supp. 488, 506 (N.D.Ill. 1966), *vacated as moot*, 375 F.2d 773 (7th Cir.1967). *Compare Marquis v. Chrysler Corp.*, 577 F.2d 624, 632–3 (9th Cir.1978) (sales quota is a goal rather than a requirement in the sense that a manufacturer is "free to rely on that provision to terminate the dealership"). Even more in point, the trial judge in *Wadena Implement Co. v. Deere & Co., Inc.*, 480 N.W.2d 383 (Minn. App.1992), ruled that average market penetration had not been established as a true "requirement" by Deere, authorizing termination under a similar statute for failure to perform.

The statutory language is ambiguous for another reason. In the introductory portion of the statute, it is explicitly stated that a good cause termination of a dealership for failure to comply with "requirements" imposed by the manufacturer refers to "essential" requirements; that is, conditions that are generally enforced by termination. The failure to include the qualifier in subparagraph (8) can be argued as an invitation to a different definition of "requirements" there or as simply a failure to use an unnecessary term a second time. I am presently inclined toward equating the two references to requirements, and construing the term as contemplating a "flunk test."

Using the rigorous meaning of the term, it is improbable that Heck has "consistently" fallen below the mark. *Wadena* says that means a failure to comply "two years in a row." 480 N.W.2d at 388. Perhaps three years in a row is a better test of "consistent" failure. By either test, if 20 or 22% is used as a rigid requirement, Heck was not subject to the termination notice dated August 1995, by reason of its 1993 performance, the next to the last full year known to Deere at the time the notice was given.

Another issue raised by Heck is that Deere has failed to identify "comparable marketing areas." Heck claims that the good farmland in Holt County draws dealers like ducks, and that other territories are not "comparable" because they are less picked over by nonresident dealers. Deere may claim this is circular reasoning presented by an unambitious sales organization, but the issue has not been adequately developed, and probably presents " 'fair ground for litigation and thus for more deliberate investigation.' " *Semmes Motors, Inc. v. Ford Motor Company*, 429 F.2d 1197, 1206 (2d Cir.1970).[3] If Heck's territory has "the sixth highest potential in the State of Missouri," it may be pertinent to trace market penetration by resident dealers in the ten best territories, to see whether the resident dealer has, unlike Heck, been able to dominate the market.

To note a point favoring Deere, I consider it unlikely that Heck can satisfy me that the market penetration issue was pretextual. I doubt that Heck has been threatened with termination because of some old grudge, based on a controversy involving long-departed personnel, some six years ago. By almost any reckoning, Heck's market penetration looks mediocre to miserable, and has been of sufficient concern that an additional salesman has been recommended and promised for quite a few years.

Based on the debatable statutory issues presented by Heck, and the balance of hardship weighing heavily in its favor, I conclude that a preliminary injunction should issue, and that the case should be scheduled for early trial.

■ Regarding bond requirements, for reasons already stated I conclude that Deere's theoretical loss is entirely speculative. The preliminary injunction may in fact assist Deere in holding its own in the Holt County market and could be useful to achieving an easy transition if final relief is denied.

**3.** I am inclined to believe that the *Semmes* articulation is captured in the *Dataphase* requirement of a "substantial question" (640 F.2d at 113), but ruling is not needed because I currently believe Heck to be asserting a statutory claim that is sufficiently likely to succeed to warrant preliminary relief, by any standard used.

No bond is justified or will be required. It is therefore

ORDERED that defendant take no action inconsistent with the continuation of plaintiff's dealership during the course of litigation, until further order of the court. It is further

ORDERED that no bond is required as security for this order. It is further

ORDERED that a trial date be established by the deputy clerk no later than September 1996, and that the parties propose a scheduling order for pretrial proceedings within two weeks of this date.