STATE of Minnesota, by its Attorney General, Mike HATCH, Respondent,

v.

CROSS COUNTRY BANK, INC., et al., Appellants.

No. A05–205.

Court of Appeals of Minnesota.

Sept. 13, 2005.

Mike Hatch, Attorney General, Erik A. Lindseth, Assistant Attorney General, St. Paul, MN, for respondent.

Alan H. Maclin, Margaret K. Savage, Briggs & Morgan, P.A., Minneapolis, MN; and Burt M. Rublin (pro hac vice), Ballard, Spahr, Andrews & Ingersoll, L.L.P., Philadelphia, PA, for appellants.

Considered and decided by PETERSON, Presiding Judge; HALBROOKS, Judge; and STONEBURNER, Judge.

# OPINION

STONEBURNER, Judge.

Respondent State of Minnesota sued appellants, a bank that issues credit cards

and the company that collects payment on the cards, alleging violations of the Uniform Deceptive Trade Practices Act, Consumer Fraud Act, Automatic Dialing–Announcing Devices Act, and the tort of invasion of privacy by intrusion upon seclusion. In this appeal, appellants challenge the district court's denial of their motion to compel arbitration of the tort claim and grant of a temporary injunction governing collection procedures. We affirm in part and reverse in part.

## FACTS

Appellant Cross Country Bank (CCB) is a Delaware-based, state-chartered bank that issues credit cards to consumers in the "subprime" market, i.e., people with a poor credit rating or low income. Appellant Applied Card Systems, Inc. (ACS) is a Delaware corporation that performs credit-card-servicing functions for CCB, including collection of delinquent accounts.

Respondent, the Minnesota Attorney General (the state), sued CCB and ACS, alleging that ACS's collection procedures violate the Deceptive Trade Practices Act (Minn.Stat. § 325D.44, subd. 1 (2004)) (DTPA); Prevention of Consumer Fraud Act (Minn.Stat. § 325F.69, subd. 1 (2004)) (CFA); and Automatic Dialing–Announcing Devices Act (Minn.Stat. § 325E.26 (2004)) (ADADA). The state also asserted a tort claim of invasion of privacy, specifically, intrusion upon seclusion.

The state requested relief in the form of: (1) a declaratory judgment that appellants violated the statutory provisions and committed tortious invasions of privacy on multiple occasions; (2) an injunction preventing appellants from engaging in the acts described in the complaint and/or otherwise violating the statutes invoked or committing further tortious invasions of privacy; (3) judgment for civil penalties under Minn.Stat. § 8.31, subd. 3 (2004), for each violation of the statutes and for each tortious invasion of the privacy of a Minnesota citizen; (4) "restitution under the parens patriae doctrine, Minn.Stat. § 8.31, the general equitable powers of this court ... and any other authority for all persons injured by [appellants'] acts"; and (5) costs and attorney fees.

The state moved for a temporary injunction enjoining appellants' further violations of Minnesota statutes and acts of intrusion upon seclusion.[1] The state submitted affidavits of CCB credit-card holders; card holders' family members, acquaintances, employers, and colleagues; people who assert that they received collections calls for CCB card holders whom they did not know, and former ACS employees. The affidavits describe a variety of allegedly unfair, deceptive or fraudulent, abusive, illegal, and intrusive practices by ACS debt collectors, including:

- calling consumers multiple times per day or multiple times within a very short period of time;
- calling consumers on holidays such as Easter and Labor Day;
- referring to consumers as "idiot," "assh——," "thief," "b——," or "liar" and telling a consumer that the collector was "more important than your f——ing child" or that the consumer "talk[s] like a black person";
- ignoring or claiming not to have received multiple requests to stop calling for consumers unknown to the person answering the telephone or to stop calling card holders at their workplaces;

---

1. The state also moved to amend the complaint to add a party. That motion was granted and is not an issue on appeal.

- tying up workplace phones in a hospital and a group home by making multiple calls in a short space of time;
- providing personal financial information to card holders' colleagues and work supervisors;
- calling homes as early as 6:30 a.m. and as late as 11:00 p.m.;
- using an auto-dialing machine to give consumers pre-recorded messages without first obtaining permission to send such messages;
- threatening legal action that was never taken;
- threatening to foreclose on card holders' homes and/or repossess all their possessions;
- threatening to report card holders to immigration authorities;
- identifying themselves by aliases or misleading titles, such as "Adam Dunn, Director of Federal Fraud Investigations";
- adopting misleading tones of voice to "trick" phone answerers into believing it was a friend calling or that an emergency had occurred;
- engaging in a practice called "assumptive pay-by-phone," which involves hurriedly giving a consumer a confirmation number while falsely asserting that the customer has permitted payment of a balance, and if the customer accepts the confirmation number, withdrawing funds from the customer's account;
- withdrawing money from customer bank accounts without any prior authorization, by using bank routing

numbers from checks tendered for previous payments;
- agreeing to accept a certain amount as payment to bring an account out of delinquency status or settle an account, but later asserting that the amount paid was not enough, assessing additional late fees and over-limit penalties, and attempting to collect an additional balance;
- deliberately withholding information about the actual payoff balance of an account, so that customers would pay only the balance due as of the date of the inquiry, believe they were paying in full, and would be charged additional late fees for the balance of accrued interest that was not paid off.

Some affidavits allege physical and emotional harm from such practices, including increased stress and exacerbated or potential exacerbation of heart disease, diabetes, and other pre-existing health problems. A number of affidavits from ACS employees relate that they engaged in these practices or witnessed other collectors doing so, and that ACS management either explicitly required the use of such tactics or tacitly encouraged it, such as by ignoring or not investigating employee complaints.

Appellants moved (1) for partial dismissal on the grounds that the state did not have proper parens patriae standing to bring a tort claim for invasion of privacy, (2) to compel arbitration of the state's "parens patriae" claim(s),[2] and (3) to strike an affidavit of appellants' former general counsel.[3]

Appellants submitted affidavits from current and former ACS employees.

---

2. This motion was made pursuant to a binding arbitration clause that is contained in the CCB card-holder agreement, which was accepted by card holders upon their use of the card.

3. The court's orders finding that the state has standing to bring the tort claim in its parens patriae capacity and granting the motion to strike the affidavit are not issues in this appeal.

These affidavits state that the allegations from former ACS employees are false, that the alleged activities were prohibited by ACS's policies and that any collector caught violating the policy would be terminated. ACS's site manager for the Beckley, West Virginia, facility; a manager; and a unit supervisor from the same facility, stated in largely identical affidavits that they would not have permitted actions in violation of the policies, never instructed anyone to disregard the policies, and that any supervisor caught advising collectors to disregard the policies would also be subject to termination. These individuals also denied that management pressured or counseled violation of policies or that any collectors ever committed more than minor infractions and asserted that collectors were counseled when they committed an infraction.

Appellants also submitted affidavits detailing their use, beginning in late 2002, of a collections-monitoring system called "Total View," alleged to provide a more proactive monitoring of collector practices, such as tracking the total number of calls made to a particular phone number. They also submitted an expert's affidavit detailing his observations of current collection activities and opinion that the collection practices more than complied with relevant industry standards and laws and regulations. Finally, without submitting the telephone records, appellants submitted an affidavit of a current employee describing ACS's phone records and how those records could demonstrate the number of total calls made to a consumer's phone (with the ultimate goal of proving that the affidavits submitted by the attorney general exaggerated the total number of calls made to each affiant).

The district court denied appellants' motion to compel arbitration and granted the state's request for a temporary injunction. The district court based denial of the motion to compel arbitration on the conclusion that the state, as parens patriae, is not a party to the arbitration clause contained in CCB's contracts with card holders and has not agreed to arbitrate. The district court also stated: "[appellants'] motion to compel arbitration of four claims brought by the State would unnecessarily complicate the case."[4]

The temporary injunction generally restrains appellants from violating the statutory provisions cited in the complaint and imposes specific limitations on appellants' practices with regard to collection of customer accounts to prevent intrusion upon seclusion. In analyzing the request for temporary injunctive relief, the court discussed the *Dahlberg* factors and determined that the "balance of harms," likelihood of success on the merits, and the "public policy" factors all favored injunctive relief. The injunction was entered after the court denied appellants' motion to modify the injunction. This appeal, challenging the district court's denial of appellant's motion to compel arbitration and grant of the temporary injunction, followed.

### ISSUES

1. Did the district court err by denying appellants' motion to compel the state to arbitrate its claim for tortious intrusion upon seclusion?

2. Did the district court err by granting injunctive relief without making a finding that the state would suffer

---

4. Despite the district court's reference to a motion to compel arbitration of four claims, the record is clear that appellants only sought to compel arbitration of the tort claim for invasion of privacy.

irreparable harm and that legal remedies were inadequate?

## ANALYSIS

### I. Denial of motion to compel arbitration of tort claim

■ This court reviews de novo the denial of a motion to compel arbitration. *Johnson v. Piper Jaffray, Inc.,* 530 N.W.2d 790, 795 (Minn.1995). Appellants assert that the state, acting under its parens patriae authority, has stepped into the shoes of CCB card holders and is therefore subject to the arbitration agreement contained in CCB's contracts with card holders. Appellants suggest that, because the facts underlying the state's claim are the same facts that would permit private relief, the state is necessarily seeking to protect only private interests.

■ The state argues that appellants' position ignores basic contract-interpretation principles and reflects a fundamental misunderstanding of the parens patriae standing doctrine. We agree.

■ Arbitration is a matter of contract, and a party that has not agreed to arbitrate a dispute cannot be required to arbitrate. *AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co.,* 242 F.3d 777, 780 (8th Cir.2001). Under long-standing contract-law principles, a nonparty to a contract generally will not be bound by that contract. *See, e.g., Rausch v. Julius B. Nelson & Sons, Inc.,* 276 Minn. 12, 19, 149 N.W.2d 1, 6 (1967). In this case, there is no question that the state is not a party to CCB's credit-card agreement, which binds only persons "who applied to [CCB] for ... a credit card account." The question is whether the state is bound by the arbitration agreement in individual card holders' contracts with CCB under some other theory.

The state relies on *E.E.O.C. v. Waffle House,* 534 U.S. 279, 293–96, 122 S.Ct. 754, 764–65, 151 L.Ed.2d 755 (2002), in which the United States Supreme Court held that the EEOC was not required to arbitrate a suit it brought pursuant to its authority to enforce the Americans with Disabilities Act (ADA), even though the employee on whose behalf the claim was pursued had signed an employment contract that contained a mandatory arbitration clause, and the EEOC sought victim-specific relief. In *Waffle House,* the court stated: "we are persuaded that ... whenever the EEOC chooses ... to bring an enforcement action in a particular case, the agency may be seeking to vindicate a public interest ... even when it pursues entirely victim-specific relief." *Id.* at 295–96, 122 S.Ct. at 765.

> If it were true that the EEOC could prosecute its claim only with [the employee's] consent, or if its prayer for relief could be dictated by [the employee], the [circuit] court's analysis might be persuasive. But once a charge is filed, the exact opposite is true under the statute—the EEOC is in command of the process.

*Id.* at 291, 122 S.Ct. at 762–63.

■ In this case, the state is in a position similar to the EEOC's position in *Waffle House.* The state, like the EEOC, is pursuing its claim, not with the purpose of obtaining relief for particular victims, but to vindicate a "quasi-sovereign" interest: protecting the privacy of its citizens. A parens patriae claim is founded on the state's assertion of a "quasi-sovereign" interest that grows out of, but surpasses, the interests of individual citizens. *See State by Humphrey v. Standard Oil Co.,* 568 F.Supp. 556, 563 (D.Minn.1983) (stating that "the *parens patriae* doctrine allows a state to maintain a legal action where state citizens have been harmed, where the state

maintains a quasi-sovereign interest.... A state maintains a quasi-sovereign interest ... where the health and well-being of its residents is affected") (citation omitted). The *doctrine is one of standing,* and an injury to the state and a real interest of the state's own are prerequisites for bringing the claim. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 600–01, 102 S.Ct. 3260, 3265, 73 L.Ed.2d 995 (1982) (explaining that a parens patriae suit "does not involve the States stepping in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves."). As in *Waffle House,* the individuals in this case, whose privacy was allegedly violated, are not directing or controlling the state's action or the prayer for relief.

Just as the state does not step into the shoes of victims of crime when it acts in its prosecutorial role, the state does not step into the shoes of individual card holders in this case but acts as an independent party. The state is asserting a state interest that is based on the facts involving individual card holders. *See Standard Oil Co.,* 568 F.Supp. at 565 (stating that when the state acts in its quasi-sovereign capacity in a parens patriae action, "the state becomes, in effect, the embodiment of its citizens. A harm to the individual citizens becomes an injury to the state, and the state in turn becomes the plaintiff.").

Similar to the EEOC's statutory authority to pursue discrimination claims on behalf of individual victims, the attorney general has the authority to investigate and prosecute statutory violations, as well as to assert other claims on behalf of the state to protect public rights. *See State v. Ri-Mel, Inc.,* 417 N.W.2d 102, 112 (Minn.App. 1987) (stating that "[c]ommon law has also recognized the attorney general has broad powers, which are not limited by statute,

and may maintain an action for enforcement of the state's laws and for the protection of public rights"), *review denied* (Minn. Feb. 17, 1988); Minn.Stat. § 8.31 (granting attorney general power to investigate and bring suit to prevent violations of various state statutes). It is not dispositive that the attorney general seeks victim-specific relief or that the claim is based on the facts that could permit an individual to obtain relief through a private tort claim. That was the situation in *Waffle House* as well. The state's purpose in bringing the claim is to secure protection of a public interest. The United States Supreme Court specifically recognized that future violations may be best deterred by seeking victim-specific monetary relief, rather than non-victim-specific injunctive relief. *See Waffle House,* 534 U.S. at 295, 122 S.Ct. at 765 (noting that "[p]unitive damages may often have a greater impact ... than the threat of an injunction.").

Appellants' argument that res judicata principles demonstrate that the state is only enforcing the card holders' individual interests is without merit. The Court in *Waffle House* specifically stated that, "[t]he fact that ordinary principles of res judicata, mootness, or mitigation may apply ... does [not] render the EEOC a proxy for the employee." *Id.* at 298, 122 S.Ct. at 766.

Appellants cite a number of cases in which a nonsignatory to an arbitration contract has been obligated to arbitrate a claim, but the cases relied on are inapposite because they involved assignment of a contract, reliance by the nonsignatory on the contract under a third-party-beneficiary theory, or situations where the nonsignatory's claim is asserted on behalf of a party who signed the arbitration agreement.[5] No such circumstances are present here.

---

**5.** *See Int'l Paper Co. v. Schwabedissen Maschi-* *nen & Anlagen GMBH,* 206 F.3d 411, 418 (4th

■ We also reject appellants' argument that the Federal Arbitration Act, 9 U.S.C. §§ 1–16 (2000), compels arbitration in this matter. The purpose of the FAA is to "place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991). The various provisions of the FAA providing that valid contractual agreements to arbitrate must be enforced "have [been] read ... to 'manifest a liberal federal policy favoring arbitration agreements.'" *Waffle House, Inc.*, 534 U.S. at 289, 122 S.Ct. at 762 (quoting *Gilmer*, 500 U.S. at 25, 111 S.Ct. at 1651 (quotation omitted)). But, as noted in *Waffle House*, it is the language of the contract, not the FAA policy in favor of arbitration, that defines the scope of disputes subject to arbitration. "[N]othing in the statute authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement." *Id.* The FAA only applies when there is an agreement to arbitrate. As discussed above, the state in this case is not party to or bound by the agreement to arbitrate.

Other cases appellants rely on for the proposition that the pro-arbitration policy expressed in the FAA mandates arbitration of the tort claim in this case are also inapposite. Those cases dealt with conflicting state or federal laws that purported to remove an entire class of claims from

arbitration. *See, e.g., Allied–Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 281, 115 S.Ct. 834, 843, 130 L.Ed.2d 753 (1995) (involving determination that contract was within scope of FAA coverage and thus state anti-arbitration law could not apply); *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 227, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987) (recognizing that a federal statute could remove claims from beyond the reach of FAA's pro-arbitration policy if Congress clearly expressed intent to do so). This case merely involves the determination of whether a plaintiff is bound by an arbitration clause in a contract to which it is not a party, not whether a legislative body, federal or state, has attempted to preclude a set of claims from decision in an arbitration forum. The FAA policy favoring arbitration of disputes does not compel the state to arbitrate its tort claim in this case, and the district court did not err by denying appellants' motion to compel arbitration of the state's claim for intrusion upon seclusion.

## II. Grant of temporary injunction

■ A district court's decision to issue an injunction will not be overturned absent a clear abuse of discretion. *Carl Bolander & Sons Co. v. City of Minneapolis*, 502 N.W.2d 203, 209 (Minn.1993). "A district court's findings regarding entitlement to injunctive relief will not be set

Cir.2000) (noting that equitable estoppel doctrine recognizes that a claimant "may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him" as a third-party beneficiary); *Quackenbush v. Allstate Ins. Co.*, 121 F.3d 1372, 1380–82 (9th Cir.1997) (requiring claims of the California Insurance Commissioner, asserted as trustee on behalf of the insolvent reinsureds to recover reinsurance proceeds, to be arbitrated); *SouthTrust*

*Bank v. Ford*, 835 So.2d 990, 993–94 (Ala. 2002) (holding that administrator of estate asserting a claim on behalf of the estate "stands in [decedent's] shoes" and is bound to arbitrate claim as signatory decedent would have been had he asserted claim himself); *Ill. Farmers Ins. Co. v. Glass Serv. Co.*, 683 N.W.2d 792, 803–05 (Minn.2004) (holding plaintiff must arbitrate claims, although it was nonsignatory to arbitration clauses, when plaintiff had received assignments from the individual insureds of their claims under the contract that contained the arbitration clause).

aside unless clearly erroneous." *Haley v. Forcelle,* 669 N.W.2d 48, 55 (Minn.App. 2003), *review denied* (Minn. Nov. 23, 2003). "It is error, however, for the trial court to grant injunctive relief without evaluating specific factors." *Wadena Implement Co. v. Deere & Co., Inc.,* 480 N.W.2d 383, 388–89 (Minn.App.1992) (citing *M.G.M. Liquor Warehouse Int'l, Inc. v. Forsland,* 371 N.W.2d 75, 77 (Minn.App.1985)), *review denied* (Minn. Mar. 26, 1992).

▬ Generally, the factors a court must consider in granting injunctive relief include the relationship between the parties, the relative harm to the parties if injunctive relief is granted or denied, the party's likelihood of success on the merits, any public interest or public policy that may be involved, and the administrative burdens involved in judicial supervision and enforcement. *Mounds View v. Metro. Airports Comm'n,* 590 N.W.2d 355, 357–58 (Minn.App.1999) (citing *Dahlberg Bros. v. Ford Motor Co.,* 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965)). But when injunctive relief is explicitly authorized by statute, "proper exercise of discretion requires the issuance of an injunction if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purposes behind the statute's enactment." *Wadena,* 480 N.W.2d at 389 (citing *United States v. White,* 769 F.2d 511, 515 (8th Cir.1985)); *see also State by Ulland v. Int'l Assoc. of Entrepreneurs of Am.,* 527 N.W.2d 133, 137 (Minn. App.1995) (approving use of *Wadena* factors in context of temporary injunction except when a party disputed that it was subject to the statute to be enforced, in which case the trial court must consider the *Dahlberg* factors), *review denied* (Minn. Apr. 18, 1995).

The statute granting the attorney general authority to enforce laws related to unfair, discriminatory, and unlawful practices in business, commerce, or trade, provides that

[i]n addition to the penalties provided by law for violation of the [statutes the attorney general is charged with enforcing], specifically and generally, whether or not injunctive relief is otherwise provided by law, the courts of this state are vested with jurisdiction to prevent and restrain violations of those laws.... On becoming satisfied that any of those laws has been or is being violated, or is about to be violated, the attorney general shall be entitled, on behalf of the state; (a) to sue for and have injunctive relief ... against any such violation or threatened violation without abridging the penalties provided by law....

Minn.Stat. § 8.31, subd. 3 (2004).

The Minnesota Deceptive Trade Practices Act (DTPA) provides that:

A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. Proof of monetary damage, loss of profits, or intent to deceive is not required.

Minn.Stat. § 325D.45, subd. 1 (2004).

The Consumer Fraud Act (CFA) provides that:

The attorney general or any county attorney may institute a civil action in the name of the state in the district court for an injunction prohibiting any violation of sections 325F.68 to 325F.70. The court, upon proper proof that defendant has engaged in a practice made enjoinable by section 325F.69, may enjoin the future commission of such practice. It shall be no defense to such an action that the state may have adequate remedies at law.

Minn.Stat. § 325F.70, subd. 1 (2004).

The Automatic–Dialing–Announcing Devices Act provides that:

A person who is found to have violated sections 325E.27 to 325E.30 is subject to the penalties and remedies, including a private right of action to recover damages, as provided in section 8.31.

Minn.Stat. § 325E.31 (2004).

■ Appellants do not dispute that they are subject to the above-cited statutes, which specifically authorize injunctive relief. Under *Ulland* and *Wadena*, therefore, the district court was not required to make findings on the *Dahlberg* factors to enjoin violation of the statute. The district court had only to consider whether the state showed that appellants violated or were about to violate the statutes involved and whether injunctive relief would fulfill the legislative purpose of the statutes. *Ulland*, 527 N.W.2d at 137; *Wadena*, 480 N.W.2d at 389.

Despite *Wadena's* holding, the district court analyzed this case under *Dahlberg*. Appellants, however, do not challenge the district court's use of the *Dahlberg* factors or any of the district court's specific findings on the *Dahlberg* factors. Instead, appellants argue that the district court erred by failing to make any finding that Minnesota citizens would suffer irreparable harm absent entry of a temporary injunction and lack an adequate remedy at law for appellants' alleged improper debt-collection activities.

Appellants rely on Minnesota cases holding that irreparable harm and inadequate remedy at law are threshold issues that a party seeking an injunction must establish before a district court further analyzes any factors relating to issuance of an injunction. *See Mounds View*, 590 N.W.2d at 357 (citing *Cherne Indus., Inc. v. Grounds & Assocs.*, 278 N.W.2d 81, 92 (Minn.1979), and describing these factors as a "threshold showing," necessary before application of the *Dahlberg* factors).

■ All of the cases relied on by appellants involve application for the equitable remedy of injunctive relief, as opposed to injunctive relief imposed as a specifically authorized statutory remedy. We conclude that when the legislature has explicitly authorized the state to obtain injunctive relief to prevent violation of statutes that protect consumers, the legislature has obviated a showing of irreparable harm and inadequate legal remedy. This court has previously held that, in an action under the DTPA, it is unnecessary for the court to find inadequacy of legal remedies before issuing injunctive relief, noting that injunctive relief is the only type of remedy available under the statute. *See Dennis Simmons D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 339 (Minn.App.1999) (stating that generally injunctive relief is reserved for circumstances when legal remedies are inadequate, but that the legislature, in the case of the DTPA, has allowed injunctive relief against "deceptive trade practices regardless of damages or other remedies available at law"). Furthermore, the language of the CFA provides that "[i]t shall be no defense to such an action that the state may have adequate remedies at law." Minn.Stat. § 325F.70, subd. 1. And *Wadena* supports the conclusion that a showing of irreparable harm is unnecessary when a statute specifically authorizes injunctive relief. 480 N.W.2d at 389 (citing *White*, 769 F.2d at 515); *see also Envtl. Def. Fund v. Lamphier*, 714 F.2d 331, 338 (4th Cir.1983) (stating that when a statute authorizes injunctive relief for its enforcement, plaintiffs need not plead and prove irreparable injury); *State v. NOS Commc'ns, Inc.*, 120 Nev. 65, 84 P.3d 1052, 1054–55 (2004) (holding that in statutory enforcement action under consumer-protection statutes, state need only show reasonable likelihood that statute was violated and need not make showing of irreparable harm or inadequacy of legal

remedy because these factors are presumed in a statutory enforcement action).

 We conclude that the district court did not err or abuse its discretion by issuing a temporary injunction to prohibit violation of the DTPA, CFA, or ADADA without making a specific finding of irreparable harm or inadequacy of legal remedy. But a finding of irreparable harm and inadequacy of legal remedy remains a threshold requirement before injunctive relief can be granted on the state's common-law tort claim for invasion of privacy. Because the district court failed to make such findings, we reverse paragraph seven of the injunction, the portion referring to intrusion upon seclusion.

 Appellants also assert that the district court abused its discretion by issuing the temporary injunction without making any finding that allegedly improper debt-collection activities were ongoing or likely to occur in the future, noting that the court relied on allegations of misconduct as described by disgruntled former employees who had worked at a facility that was closed one and one-half years before the temporary injunction was issued. We note that *Wadena* and *Ulland* do not require a finding of current or ongoing violation, only a showing that appellants violated or are about to violate the statutes. And the enforcement statute provides that the attorney general may seek and have injunctive relief upon a showing that the statute has been, is currently being, or is about to be violated. Minn.Stat. § 8.31, subd. 3.

 Finally, we conclude that the district court's findings, although not couched in the language of the *Wadena* factors,

demonstrate that the court found a sufficient showing of a violation of the statutes under which the state sought injunctive relief.[6] Acknowledging that some of the affidavits filed by the state may be impeached for one reason or another, the district court stated: "the fact remains that even in the best light, the basic charges enunciated in the Complaint remain unanswered."

As the state points out in its brief, the record contains much more than the affidavits of a few "disgruntled employees" from a closed facility. The record includes numerous affidavits from card holders who allegedly experienced fraudulent and deceptive practices, as well as affidavits of former employees corroborating that such practices were ordinary and expressly or tacitly encouraged. The district court specifically found that the likelihood of the state's success on the merits weighed in favor of issuing the temporary injunction. We conclude that the district court's finding of likely success on the merits is supported by the record, is not clearly erroneous, and satisfies the requirement of a sufficient showing that prerequisites for the statutory remedies have been demonstrated to support the issuance of a temporary injunction in this case.

## DECISION

The state is not bound by the arbitration clause contained in card holders' agreements with appellants and the district court did not err by denying appellants' motion to compel arbitration. The district court did not err or abuse its discretion by issuing a temporary injunction regarding the DTPA, CFA, and ADADA based on findings sufficient to establish a

---

6. Appellants do not argue that an injunction does not fulfill the legislative purposes behind the statutes' enactment, and even if they had raised such a challenge, the district court's

discussion of public-policy considerations favoring issuance of an injunction is sufficient to meet this factor of the *Wadena* analysis.

showing of statutory violations and that issuance of a temporary injunction fulfills the legislative purposes behind the enactment of those statutes. But the district court erred by issuing injunctive relief on the state's common-law tort claim for intrusion upon seclusion without making a finding of irreparable harm or inadequacy of the legal remedy.

**Affirmed in part and reversed in part.**