James M. JOHNSON, et
al., Respondents,

v.

PRINCETON PUBLIC UTILITIES COMMISSION, defendant and third party plaintiff, Appellant,

v.

Hydrocon, Inc., Third Party Defendant.

A16-1737

Court of Appeals of Minnesota.

Filed July 10, 2017

Grim Daniel Howland, James E. Lindell, Lindell & Lavoie, LLP, Minneapolis, Minnesota (for respondents).

John M. Baker, Katherine M. Swenson, Kathryn N. Hibbard, Greene Espel PLLP, Minneapolis, Minnesota (for appellant).

Susan L. Naughton, League of Minnesota Cities, St. Paul, Minnesota (for amicus curiae League of Minnesota Cities).

Considered and decided by Peterson, Presiding Judge; Smith, Tracy M., Judge; and Randall, Judge.*

## OPINION

### PETERSON, Judge

In this appeal following a remand by this court to the district court, appellant public utilities commission argues that the district court erred by (1) concluding that it is not a political subdivision of the state entitled to a lower preverdict interest rate under Minn. Stat. § 549.09, subd. 1(c)(1)(i); and (2) declining to grant a collateral-source offset for workers' compensation benefits paid to the injured respondent. We affirm the district court's collateral-source decision, but reverse the award of preverdict interest at the rate of ten percent per year and remand for a preverdict interest award at the statutory four-percent rate that applies to a judgment or award against a political subdivision of the state.

## FACTS

While employed by Hydrocon, Inc., a sewer-and-water contractor, respondent James Johnson was working on a water main for an ice arena in the City of Princeton. An employee of appellant Princeton Public Utilities Commission (PUC) agreed to secure a utility pole located near where Johnson was operating a compacting machine. Johnson told the PUC employee that he had finished compacting the soil, and the PUC employee released the utility pole from the truck that secured it. The pole fell on Johnson's machine, which caused injuries to Johnson's neck and back.

Johnson received workers' compensation benefits from Hydrocon and settled his workers' compensation claims in February 2011. Hydrocon assigned its indemnity and subrogation rights to PUC in a reverse-*Naig* settlement.[1] Johnson and his

---

*\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.*

1. "A reverse-*Naig [v. Bloomington Sanitation,* 258 N.W.2d 891 (Minn. 1977)] settlement occurs when the tortfeasor settles potential subrogation claims for workers' compensation

wife, respondent Sherri Johnson, sued PUC for negligence in September 2011.

After a trial, the jury returned a special verdict on October 22, 2013, finding that PUC was negligent and its negligence was a direct cause of harm to Johnson. The jury also found that Johnson was negligent but his negligence was not a direct cause of his injuries. The jury then considered all of the negligence that contributed as a direct cause of Johnson's injuries and attributed 70% of the negligence to PUC and 30% to Johnson. Finally, the jury awarded Johnson $40,000 for past bodily and mental harm and $200,000 for past loss of earnings and declined to award any other damages.

On October 29, 2013, one week after the jury returned its special verdict, PUC moved for an order directing entry of judgment in the amount of $0 pursuant to PUC's motion for collateral-source determination. PUC cited the workers' compensation act, Minn. Stat. § 176.061, and the collateral-source statute, Minn. Stat. § 548.251, and argued that because Johnson received workers' compensation benefits in excess of the amount of the jury award, judgment should be entered for $0.

In January 2014, the district court issued an order for a new trial based on the inconsistency between the jury's special-verdict finding that Johnson's negligence was not a direct cause of his injuries and its finding that 30% of all of the negligence that contributed as a direct cause of Johnson's injuries should be attributed to Johnson. Respondents moved for reconsideration. In May 2014, in response to respondents' motion to reconsider, the district court amended its new-trial order to allow respondents to choose between entry of judgment for 70% of the original verdict

or a new trial on only the issues of liability and comparative fault.

The district court interpreted respondents' response to this order to be that respondents did not intend to reject entry of judgment for 70% of the original verdict and that they were not seeking a new trial. The district court then concluded that $48,450 of the workers' compensation benefits that Johnson received were for wage-loss benefits, and, under the collateral-source rule, the $200,000 jury verdict for past loss of earnings should be reduced by $48,450. In an order filed July 11, 2014, the district court awarded respondents 70% of the remaining $151,550 for past loss of earnings and 70% of the $40,000 jury verdict for past bodily and mental harm, resulting in an award of $134,085. The district court denied both parties' posttrial motions for judgment as a matter of law and entered judgment on December 2, 2014.

On appeal, this court affirmed the district court's orders denying both parties judgment as a matter of law. *Johnson v. Princeton Pub. Utils. Comm'n*, No. A15-0038, 2016 WL 22243, at *3-5 (Minn. App. Jan. 4, 2016). But this court reversed the district court's collateral-source reduction after concluding that PUC failed to comply with the collateral-source statute when it brought its motion for collateral-source reduction more than eight months before, rather than within ten days after, the district court's order for judgment on July 11, 2014, pursuant to the jury's special verdict. This court also reversed the district court's reduction of the jury's award based on comparative fault and directed the district court on remand to enter judgment for $240,000. This court concluded that, be-

benefits with the employer and the employer's workers' compensation insurer." *Sayre v. McGough Constr. Co.*, 580 N.W.2d 503, 504,

n.1 (Minn. App. 1998), *review denied* (Minn. Aug. 18, 1998).

cause the jury should not have answered the special-verdict question regarding apportionment of fault, its answer had no legal effect.

On remand, the district court entered judgment in favor of respondents for $240,000. Three days later, on April 21, 2016, PUC filed a motion seeking a reduction of the judgment under the workers' compensation and the collateral-source statutes. Based on this court's direction to enter judgment in the amount of $240,000, the district court concluded that it lacked authority to grant PUC's motion.

Respondents filed a motion in district court seeking an award for interest, costs, and disbursements. On October 25, 2016, the district court issued a second amended order for judgment awarding respondents $240,000, plus preverdict interest at the rate of ten percent per year, and costs of $37,267.91. The district court concluded that the ten-percent rate applied because the judgment was not a judgment against a political subdivision of the state.

This appeal followed.

## ISSUES

I. When awarding preverdict interest under Minn. Stat. § 549.09, subd. 1 (2016), is a judgment against PUC a judgment against a "political subdivision of the state"?

II. Did the district court err in determining that it could not consider PUC's motion seeking a collateral-source reduction of the judgment entered on remand?

## ANALYSIS

### I.

■ PUC argues that the district court erred by applying a ten-percent interest rate to calculate preverdict interest on respondents' damages award. We agree. The preverdict-interest statute establishes the method to be used when computing interest on pecuniary damages from the time an action is commenced. *See* Minn. Stat. § 549.09, subd. 1(b) (stating that preverdict interest on pecuniary damages shall be computed as provided in Minn. Stat. § 549.09, subd. 1(c)).

Under the preverdict-interest statute, judgments against the state or a political subdivision of the state are treated differently than other judgments. The statute provides that "[f]or a judgment or award over $50,000, other than *a judgment or award for or against* the state or *a political subdivision of the state* . . ., the interest rate shall be ten percent per year until paid." Minn. Stat. § 549.09, subd. 1(c)(2) (emphasis added).

The statute also provides that "[f]or a judgment or award of $50,000 or less or *a judgment or award for or against* the state or *a political subdivision of the state*, regardless of the amount, . . . the interest shall be computed as simple interest per annum." Minn. Stat. § 549.09, subd. 1(c)(1)(i) (emphasis added). For these judgments or awards, the statute contains a formula for determining an interest rate each year and provides that the rate determined by this formula "or four percent, whichever is greater, shall be the annual interest rate during the succeeding calendar year."[2] *Id.*

The district court awarded respondents more than $50,000. Thus, whether preverdict interest should be calculated using a ten-percent interest rate or a four-percent interest rate depends on whether PUC is a political subdivision of the state. The preverdict-interest statute provides that, for

---

2. During the relevant years for calculating respondents' preverdict interest, four percent was greater than the interest rate determined by the statutory formula.

its purposes, " 'political subdivision' includes a town, statutory or home rule charter city, county, school district, or any other *political subdivision of the state.*" Minn. Stat. § 549.09, subd. 1(e)(2) (emphasis added). Citing *Winberg v. Univ. of Minn.*, 499 N.W.2d 799, 802 (Minn. 1993), the district court concluded that, because PUC is not an entity with the power to levy taxes and is not a traditional unit of the state, it is not a "political subdivision" within the meaning of section 549.09, subdivision 1(e)(2).

██ "[S]tatutory construction is a question of law, which we review de novo." *Lee v. Lee*, 775 N.W.2d 631, 637 (Minn. 2009). The object of statutory construction is to "ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2016). We look first at the plain language of the statute to determine whether it is clear or ambiguous. *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000). Only if a statute is ambiguous will we use the rules of statutory construction to discern the legislature's intent. *Brua v. Minn. Joint Underwriting Ass'n*, 778 N.W.2d 294, 300 (Minn. 2010). A statute is ambiguous if its language "is susceptible to more than one reasonable interpretation." *Schroedl*, 616 N.W.2d at 277 (quotation omitted). But the mere lack of a definition does not make a statute ambiguous, if a reviewing court can apply a term's "common and approved usage." *City of Brainerd v. Brainerd Inv. P'ship*, 827 N.W.2d 752, 757 (Minn. 2013); *see also* Minn. Stat. § 645.08(1) (2016) (stating that when interpreting a statute, "words and phrases are construed … according to their common and approved usage").

In *Winberg*, the supreme court concluded that the University of Minnesota was not a "political subdivision" for purposes of the Minnesota Veterans Preference Act, Minn. Stat. §§ 197.455; .46 (1990). 499

N.W.2d at 803. Using language similar to the preverdict-interest statute, both of those sections in the veterans preference act provided that they applied to a veteran employed by a county, city, town, school district, or other political subdivision of this state. *Id.* at 801.

The supreme court reasoned that the university is "a unique constitutional corporation, established by territorial act in 1853 and perpetuated by the state constitution in 1857." *Id.* at 801. Under the state constitution, the university's affairs and property are governed by the board of regents, which is not subject to legislative or executive control, but the university is not above the law. *Id.* The supreme court explained that the legislature recognizes this unique constitutional status, and

> if the legislature had intended the Veterans Preference Act to apply to the University of Minnesota, it most likely would have included the University by specific reference. Using Minn. Stat. § 645.27, a rule of statutory construction which provides that "the state is not bound by the passage of a law unless named therein," the University, which is itself a constitutional arm of the state, would not be bound by the Veterans Preference Act unless explicitly named.

*Id.* at 801-02. The supreme court concluded that the legislature had not specifically included the university within the purview of the veterans preference act and held that the university is not a "political subdivision" to which the veterans preference act applied. *Id.* at 803.

In *Winberg*, the supreme court also stated:

> Nor does the case law suggest that the University should be considered a political subdivision of the state to which the Act applies. The only case defining "political subdivision" for purposes of the Veterans Preference Act is *Dahle v.*

*Red Lake Watershed Dist.,* 354 N.W.2d 604, 606 (Minn. Ct. App. 1984), in which the court of appeals determined that watershed districts are political subdivisions within the meaning of section 197.46 because they are "empowered to cause taxes to be levied." Because the University has no direct or indirect power to cause taxes to be levied, it is not a political subdivision under this definition.

Finally, the term "political subdivision" is commonly understood to mean an entity with a prescribed area and authority for subordinate local government. "Political subdivision," as used in the Veterans Preference Act and other Minnesota statutes, consistently refers to such traditional units of the state as counties and cities.

*Id.* at 802. This is the portion of *Winberg* that the district court relied on in concluding that PUC is not a "political subdivision" within the meaning of section 549.09, subd. 1(e)(2).

The district court's reliance was misplaced. In *Winberg,* having concluded that the university would not be bound by the veterans preference act unless explicitly named, the supreme court considered whether the term "political subdivision" included the University. The supreme court considered two definitions of "political subdivision," and first concluded that the university was not bound by the act under the definition of "political subdivision" that this court applied in *Dahle v. Red Lake Watershed Dist.,* 354 N.W.2d 604 (Minn. App. 1984), because the university had no power to levy a tax. The supreme court then concluded that the university was not bound by the act under the common meaning of "political subdivision" because the university was not a traditional unit of the state with a prescribed area and authority for subordinate local govern-

ment, such as a county or city. *Id.* at 802-03.

We agree with the district court that PUC is not a political subdivision of the state under the definition this court applied in *Dahle*; like the university, PUC has no power to levy a tax. But we do not agree with the district court that, because PUC is not a traditional unit of the state, such as a county or city, it is not a political subdivision of the state within the meaning of Minn. Stat. § 549.09, subd. 1(e)(2).

■  Under the plain language of Minn. Stat. § 549.09, subd. 1(e)(2), towns, cities, counties, and school districts are explicitly included in the definition of "political subdivision." But the definition also includes "any other political subdivision of the state." The phrase "any other" indicates that entities other than the specifically identified entities are included in the definition of political subdivision and refutes a limiting construction that includes only traditional units of the state. However, because the definition of "political subdivision" includes "any other political subdivision," it essentially lacks a definition of entities other than those that are specifically identified in the statute. Consequently, we must construe "political subdivision" according to its common and approved usage. As the supreme court stated in *Winberg,* " 'political subdivision' is commonly understood to mean an entity with a prescribed area and authority for subordinate local government." 499 N.W.2d at 802. *See also Black's Law Dictionary* 1346 (10th ed. 2014) (defining "political subdivision" as "[a] division of a state that exists primarily to discharge some function of local government").

Unlike the University of Minnesota, PUC is not a unique constitutional arm of the state not subject to legislative or executive control. The legislature has authorized any statutory city to "own and operate

any waterworks, district heating system, or gas, light, power, or heat plant for supplying its own needs for utility service or for supplying utility service to private consumers or both." Minn. Stat. § 412.321, subd. 1. The legislature has also authorized any statutory city to establish a public utilities commission to operate any public utility in accordance with the provisions of Minn. Stat. §§ 412.321-.391. Minn. Stat. § 412.331.

Members of a public utilities commission are appointed by the city council. Minn. Stat. § 412.341, subd. 1. A public utilities commission has the power to (1) extend, modify, or rebuild a public utility and to enter into contracts to do so; (2) hire, manage, and pay personnel; (3) buy energy or water or fuel and supplies; (4) fix rates and adopt service rules; and (5) enter into contracts with the city council for utility services, payments, transfers, and other matters involved in the relationship between the city and the commission. Minn. Stat. § 412.361. The city council and the voters may decide to abolish the public utilities commission. Minn. Stat. § 412.391, subd. 2.

Also, when a city owns a public utility, "[a] separate fund or a separate account shall be established in the city treasury for each utility," and "[i]nto this fund or account shall be paid all the receipts from the utility and from it shall be paid all disbursements attributable to the utility." Minn. Stat. § 412.371, subd. 1. And a city's annual financial report of the city's operations is required to cover operations of public utility commissions. *See* Minn. Stat. §§ 471.697, subd. 1(a) (financial report for city with population of more than 2,500); .698, subd. 1(a) (2016) (financial report for city with population of less than 2,500). Finally, the legislature has declared that "the state of Minnesota shall be divided into geographic service areas within which

a specified electric utility shall provide electric service to customers on an exclusive basis." Minn. Stat. § 216B.37 (2016).

Together, these statutory provisions demonstrate that the legislature intended to authorize cities to provide electric service to customers in specified geographic areas and to allow cities to delegate to a public utilities commission the responsibility for performing this authorized government function. Because PUC is responsible for operating a public electric utility, it is an entity with a prescribed area and authority for subordinate local government. We, therefore, conclude that PUC is a "political subdivision," under the common and ordinary meaning of that term, and we reverse the preverdict-interest award against PUC and remand for the district court to award respondents preverdict interest at a four-percent rate.

## II.

PUC argues that the district court erred by denying its motion for a collateral-source reduction under Minn. Stat. §§ 176.061 (governing third-party liability for workers' compensation benefits) and 548.251 (2016) (governing collateral-source calculations) following this court's remand to the district court. Citing this court's opinion, the district court concluded that it lacked jurisdiction to apply a collateral-source offset on remand and denied the motion.

We review the question of "[w]hether the district court has jurisdiction to entertain a specific claim for relief . . . as a question of law, to be reviewed de novo." *City of Waite Park v. Minn. Office of Admin. Hearings*, 758 N.W.2d 347, 352 (Minn. App. 2008), *review denied* (Minn. Feb. 25, 2009). If an appellate court's decision "finally concluded the litigation in [a] case . . . the trial court is without jurisdiction to entertain [an appellant's] post-ap-

peal motion." *Mattson v. Underwriters at Lloyds of London*, 414 N.W.2d 717, 717-18 (Minn. 1987).[3] Policy considerations, including bringing litigation to "a definite conclusion with reasonable dispatch . . . support the finality of appellate decisions." *Id.* at 720. An appellate court may be unable to completely and finally dispose of a matter, but

> if something remains to be done by the court below, the appellate court will ordinarily so indicate, usually by a remand with directions or a mandate which the trial court must follow. Consequently, the scope of the finality of an appellate decision depends on what the court intends to be final, and this is determined by what the court's decision says.

*Id.*

In the earlier appeal of this case, this court concluded that, because PUC's motion for a collateral-source offset was not timely, PUC is not entitled to a collateral-source offset, *Johnson*, 2016 WL 22243, at *6, and, because the jury should not have answered the comparative-fault question on the special-verdict form, the jury's answer to that question had no legal effect and the district court abused its discretion by reducing respondents' damages award based on the jury's answer. *Id.* at *7. This court reversed the collateral-source offset and the remittitur granted by the district court and remanded with an instruction "for entry of judgment for the full amount of the jury verdict, $240,000." *Id.* There is no indication that this court contemplated any further proceedings beyond entry of judgment.

■■■■ "On remand, a district court must execute an appellate court's mandate strictly according to its terms and lacks power to alter, amend, or modify that mandate." *Drewitz v. Motorwerks, Inc.*, 867 N.W.2d 197, 209 (Minn. App. 2015) (quotation omitted), *review denied* (Minn. Sept. 15, 2015). This court's remand instruction was clear: the district court was to enter judgment in favor of respondents in the amount of $240,000. This court gave no other instruction or direction, and, on remand, the district court filed an order directing entry of judgment against PUC for $240,000, and judgment was entered.

PUC argues that it filed a timely motion for collateral-source reduction following entry of that judgment. But this court determined in the earlier appeal that PUC is not entitled to a collateral-source offset, and the language in this court's decision plainly indicates that this court intended that determination to be final. The district court did not err in determining that it did not have authority to apply a collateral-source offset on remand because that issue

---

3. The United States Supreme Court and the Minnesota Supreme Court have acknowledged that courts and parties often use concepts and language associated with "jurisdiction" imprecisely to refer to, among other things, nonjurisdictional claim-processing rules or nonjurisdictional limits on a court's authority to address a question. *See e.g., Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510, 126 S.Ct. 1235, 1242, 163 L.Ed.2d 1097 (2006) (noting that "[j]urisdiction . . . is a word of many, too many, meanings" and giving examples of imprecise use of the term (quotation omitted)); *Eberhart v. United States*, 546 U.S. 12, 16, 126 S.Ct. 403, 405, 163 L.Ed.2d 14 (2005) (discussing distinction between jurisdictional rules and "claim-processing rules"); *Rubey v. Vannett*, 714 N.W.2d 417, 422 (Minn. 2006) (noting same distinction as *Eberhart*). The outcome of this appeal will be the same whether the district court lacked jurisdiction to entertain PUC's motion for a collateral-source offset or lacked authority to depart from this court's instruction. Therefore, we will not decide whether there was a jurisdictional or a nonjurisdictional limit on the district court's authority and, instead, simply address the district court's lack of authority to apply a collateral-source offset on remand.

was already decided by this court in the earlier appeal.

## DECISION

Because a public utilities commission created by a statutory city pursuant to Minn. Stat. §§ 412.331-.391 is a political subdivision of the state for purposes of Minn. Stat. § 549.09, subd. 1(c)(1)(i), the preverdict-interest award against PUC must be calculated at a rate of four percent. Because this court's decision in the earlier appeal indicated that this court's decision that PUC is not entitled to a collateral-source offset was intended to be final, the district court, on remand, did not have authority to apply a collateral-source offset.

**Affirmed in part, reversed in part, and remanded.**