# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A23-1382

State of Minnesota by Smart Growth Minneapolis,
a Minnesota nonprofit corporation, et al.,
Respondents,

vs.

City of Minneapolis,
Appellant.

**Filed May 13, 2024**
**Reversed; motion denied**
**Ede, Judge**

Hennepin County District Court
File No. 27-CV-18-19587

Jack Y. Perry, Maren Forde, Brayanna J. Smith, Taft Stettinius & Hollister LLP, Minneapolis, Minnesota; and

Timothy J. Keane, Kutak Rock LLP, Minneapolis, Minnesota; and

Nekima Levy Armstrong, Minneapolis, Minnesota (for respondents)

Kristyn Anderson, Minneapolis City Attorney, Kristin R. Sarff, Ivan Ludmer, Munazza Humayun, J. Haynes Hansen, Assistant City Attorneys, Minneapolis, Minnesota (for appellant)

David J. Zoll, Lockridge Grindal Nauen P.L.L.P., Minneapolis, Minnesota (for amicus curiae Neighbors for More Neighbors)

Michelle E. Weinberg, Sam B. Ketchum, Kennedy & Graven, Chartered, Minneapolis, Minnesota (for amicus curiae The Sierra Club)

Paul A. Merwin, Patricia Y. Beety, League of Minnesota Cities, St. Paul, Minnesota (for amicus curiae League of Minnesota Cities)

Ann K. Bloodhart, David Theisen, George N. Henry, Metropolitan Council, St. Paul, Minnesota (for amicus curiae Metropolitan Council)

Paul Donald Reuvers, Andrew A. Wolf, Iverson Reuvers, Bloomington, Minnesota (for amicus curiae American Planning Association – Minnesota Chapter)

Considered and decided by Wheelock, Presiding Judge; Reyes, Judge; and Ede, Judge.

## SYLLABUS

A party seeking injunctive relief under the Minnesota Environmental Rights Act (MERA), Minn. Stat. §§ 116B.01-.13 (2022), has the burden of demonstrating that the requested injunctive relief is necessary or appropriate to protect the environment and will not impose unnecessary hardship on the enjoined party.

## OPINION

**EDE**, Judge

In this appeal following a previous remand from this court, appellant challenges an amended injunction order issued by the district court under the Minnesota Environmental Rights Act (MERA), Minn. Stat. §§ 116B.01-.13 (2022). Appellant asserts that the district court violated this court's remand instructions and abused its discretion in granting the amended injunction. We conclude that, although the district court did not violate our remand instructions, the district court did abuse its discretion in ordering injunctive relief that is based on legal error, that is unsupported by the evidence in the record, and that imposes unnecessary hardship on appellant. We therefore reverse the amended injunction order.

2

**FACTS**

This is the third appeal in this MERA action brought by respondents Smart Growth Minneapolis and Minnesota Citizens for the Protection of Migratory Birds (collectively, Smart Growth)[1] to challenge a comprehensive plan called Minneapolis 2040 (the 2040 Plan). *See State by Smart Growth Minneapolis v. City of Minneapolis*, 954 N.W.2d 584 (Minn. 2021) (*Smart Growth I*); *State by Smart Growth Minneapolis v. City of Minneapolis*, No. A22-0852, 2022 WL 17957328 (Minn. App. Dec. 27, 2022) (*Smart Growth II*), *rev. denied* (Minn. Apr. 18, 2023). In *Smart Growth I*, the Minnesota Supreme Court held that Smart Growth stated a claim upon which relief could be granted under MERA. 954 N.W.2d at 597. In *Smart Growth II*, this court held that the district court did not err in granting summary judgment in favor of Smart Growth on its MERA claim. 2022 WL 17957328, at *6. But we determined that the record was insufficient to facilitate review of the injunctive relief granted by the district court. *Id.* at *7. We therefore reversed in part and remanded for additional proceedings on Smart Growth's request for injunctive relief. *Id.*

In this third appeal, we must determine whether the district court abused its discretion by issuing an amended injunction order that requires appellant City of Minneapolis (the city) to cease implementation of the residential development portions of the 2040 Plan and to revert to the residential development portions of a previous

---

[1] Audubon Chapter of Minneapolis was also a plaintiff at the time this action was commenced and a respondent to the first two appeals, but it voluntarily dismissed its claim before the district court issued the amended injunction order that is at issue in this appeal.

3

comprehensive plan, The Minneapolis Plan for Sustainable Growth (the 2030 Plan). We begin by revisiting the facts and legal framework relating to the city's adoption of the 2040 Plan and Smart Growth's MERA claim before turning to a summary of this litigation and the procedural history following our previous remand.

### The 2040 Plan

The city adopted the 2040 Plan pursuant to the requirements of the Metropolitan Land Planning Act (MLPA), Minn. Stat. §§ 473.851-.871 (2022 & Supp. 2023).[2] *See Smart Growth I*, 954 N.W.2d at 587. Under the MLPA, local governmental units within the metropolitan area are required to adopt comprehensive plans and must "review and, if necessary, amend" them at least every ten years. *Id.* (quoting Minn. Stat. § 473.864, subd. 2 (2020)). Comprehensive plans are one part of the regional planning required by the MLPA, which is intended to "establish requirements and procedures to accomplish comprehensive local planning with land use controls consistent with the planned, orderly and staged development and the metropolitan system plans." Minn. Stat. § 473.851. Comprehensive plans must "contain objectives, policies, standards and programs to guide public and private land use, development, redevelopment and preservation for all lands and waters within the jurisdiction of the local governmental unit." Minn. Stat. § 473.859, subd. 1. They must also "provide guidelines for the timing and sequence of the adoption of official controls to ensure planned, orderly, and staged development and redevelopment." *Smart*

---

[2] Except as otherwise cited, all citations to the MLPA that follow are to the current version of the statute. We note that the Minnesota Legislature recently amended the MLPA in a manner that does not affect our analysis of this case. *See* 2023 Minn. Laws ch. 68, § 97, at 135-36 (amending Minn. Stat. § 473.859).

*Growth I*, 954 N.W.2d at 587 (quoting Minn. Stat. § 473.858, subd. 1 (2020)). "[T]he comprehensive plan constitutes the primary land use control for cities" and zoning and other regulations must be brought into conformity with the comprehensive plan. *Mendota Golf, LLP v. City of Mendota Heights*, 708 N.W.2d 162, 175 (Minn. 2006) (citing Minn. Stat. § 473.858, subd. 1 (2004)).

The city adopted the 2040 Plan in December 2018 as part of its statutorily required decennial review. The 2040 Plan identifies 14 goals and 100 policies to further those goals. The 100 policies are also sorted and discussed in 11 topics, each of which "contains policies that relate to the built, natural, and economic environment of the city with background information about the importance of each topic to the future of our city." Following extensive discussion of the goals and related policies, the 2040 Plan addresses implementation of those policies.

Of the many policies in the 2040 Plan, the first has garnered significant attention. Titled "Access to Housing," the first policy aims to "[i]ncrease the supply of housing and its diversity of location and types." This policy is based in part on the first goal of the 2040 Plan—to eliminate disparities in housing that "are rooted in overt and institutional racism that has shaped the opportunities available to multiple generations of Minneapolis residents." The Access to Housing policy encompasses four strategies that will allow increased density in the city. Most controversial among these is a strategy that provides: "In neighborhood interiors farthest from downtown that today contain primarily single-family homes, increase housing choice and supply by allowing up to three dwelling units on an individual lot." This strategy effectively ends single-family zoning in the city and

5

allows (but does not require) duplexes and triplexes to be built on any lot in areas that were formerly limited to single-family housing. *See Smart Growth I*, 954 N.W.2d at 587 (noting that the 2040 Plan would "result in the elimination of single-family zoning and a city-wide increase in permissible building density").

**Smart Growth's MERA Claim**

Smart Growth brought this lawsuit under MERA, which allows a private cause of action to protect the state's natural resources. *See* Minn. Stat. § 116B.03, subd. 1; *see also Smart Growth I*, 954 N.W.2d at 589-90. MERA sets forth a procedure for adjudicating such claims, whereby a plaintiff must first make "a prima facie showing that the conduct of the defendant has, or is likely to cause the pollution, impairment, or destruction of the air, water, land or other natural resources located within the state." Minn. Stat. § 116B.04(b). "Pollution, impairment, or destruction" includes "conduct which materially adversely affects or is likely to materially adversely affect the environment." Minn. Stat. § 116B.02, subd. 5. If the plaintiff makes a prima facie showing, the defendant may avoid a determination of MERA liability by "rebut[ting] the prima facie showing by submission of evidence to the contrary" or "show[ing], by way of an affirmative defense, that there is no feasible and prudent alternative and the conduct at issue is consistent with and reasonably required for promotion of the public health, safety, and welfare in light of the state's paramount [environmental concerns]." Minn. Stat. § 116B.04(b). Upon a proper showing, MERA broadly authorizes relief that is determined by a district court to be "necessary or appropriate to protect the air, water, land or other natural resources." Minn. Stat. § 116B.07.

6

Smart Growth initiated this action in December 2018, just as the Minneapolis City Council was preparing to vote on adopting the 2040 Plan. "[U]sing the legally required assumption of the immediate and full build-out of [the] 2040 Plan," Smart Growth alleged that the 2040 plan would cause significant environmental effects. Smart Growth sought injunctive relief to prevent the city from adopting the 2040 Plan until it rebutted Smart Growth's prima facie showing under MERA, "presumably through a voluntary environmental review."

Smart Growth attached to its complaint an expert report from Kirsten Pauly of Sunde Engineering PLLC (the Pauly Report), which opines on the environmental effects that would be caused by an immediate and full build-out of the 2040 Plan. The Pauly Report estimates that an additional 148,389 dwelling units would be added under a full build-out of the plan. The report then asserts that a number of adverse environmental impacts are likely to result from this intensification of density, including increased noise, pedestrian and vehicle traffic, light and glare, and stormwater runoff.

Together with its complaint, Smart Growth filed a motion for a temporary restraining order to prevent the city from adopting the plan before conducting environmental review. The district court denied the motion, and the city council voted to approve the plan in December 2018.

### *Dismissal and* Smart Growth I

After adopting the 2040 Plan, the city brought a motion to dismiss the complaint, which the district court granted in April 2019. The district court reasoned that, because comprehensive plans are exempt from environmental-review requirements under an

administrative rule implementing the Minnesota Environmental Policy Act (MEPA),[3] *see* Minn. R. 4410.4600, subp. 26 (2021), Smart Growth could not state a claim under MERA seeking environmental review as relief. The district court also determined that Smart Growth could not demonstrate a prima facie case under MERA because it had not challenged a discrete, identifiable project. Smart Growth appealed, and this court affirmed. *See State by Smart Growth Minneapolis v. City of Minneapolis*, 941 N.W.2d 741, 743 (Minn. App. 2020), *rev'd*, 954 N.W.2d 584 (Minn. 2021).

The supreme court granted Smart Growth's petition for further review and reversed. *See Smart Growth I*, 954 N.W.2d at 587. The supreme court held (1) "that adoption of a comprehensive plan can be the subject of a MERA claim" and (2) "that [Smart Growth's] allegations are sufficient to state a claim for which relief can be granted under MERA." *Id.* In so holding, the supreme court accepted as nonspeculative Smart Growth's allegation of harm based on a "full build-out" of the 2040 Plan, explaining "that build-out is what the actual land-use criteria contained in the Plan allows for." *Id.* at 596. The supreme court also reasoned that "[i]t is not inconsistent to recognize that a MERA challenge might result in environmental review that would not be required under MEPA." *Id.* at 593. The supreme court remanded the case to the district court for reinstatement of Smart Growth's complaint. *Id.* at 597.

---

[3] Minn. Stat. §§ 116D.01-.11 (2022 & Supp. 2023).

### *Summary Judgment, Injunctive Relief, and* Smart Growth II

On remand from the supreme court, following discovery, Smart Growth and the city filed cross-motions for summary judgment. In a June 2022 order, the district court denied the city's motion and granted Smart Growth's motion, reasoning that MERA allows a challenge to a comprehensive plan "when it is still just that—a plan" and thus that use of a full-build-out presumption was appropriate. The district court then relied on the Pauly Report—which forecasted environmental effects of a full build-out of the 2040 Plan—to conclude that Smart Growth had made a prima facie case under MERA. And the district court determined that the city had not submitted evidence sufficient to rebut Smart Growth's prima facie showing or to support an affirmative defense. The district court therefore granted summary judgment in favor of Smart Growth. The district court also granted injunctive relief, requiring the city to cease implementation of the 2040 Plan and revert to the 2030 Plan.

The city appealed, challenging the district court's decisions to grant summary judgment and injunctive relief. *See Smart Growth II*, 2022 WL 17957328, at *1. We affirmed the district court's grant of summary judgment, reasoning that "the supreme court has already determined that [Smart Growth's] causation theory is not speculative," and that, "under *Smart Growth [I]*, it was appropriate for the district court to base its MERA analysis on the presumption of a full build-out under the 2040 Plan." *Id.* at *4, *6. But we reversed the district court's grant of injunctive relief, reasoning as follows:

> The district court ordered the city to revert to the 2030 Plan
> without findings on the necessity and scope of injunctive relief,

9

and the analysis of this issue in its accompanying memorandum is brief[.]

. . . .

. . . Given the lack of findings supporting the district court's grant of injunctive relief, as well as the district court's limited analysis of this issue, the record is insufficient for this court to determine whether the district court properly exercised its discretion in granting injunctive relief.

*Id.* at *6-7. We therefore "reverse[d] the injunctive relief and remand[ed] for additional proceedings on [Smart Growth's] request for injunctive relief." *Id.* at *7. The city petitioned for further review. The supreme court denied the petition.

### ***Proceedings on Remand and the Amended Injunction Order***

In April 2023, Smart Growth filed a motion in district court seeking an amended injunction order imposing the same relief as the district court's June 2022 summary-judgment order. Smart Growth asserted that

> the Court of Appeals' remand very narrowly requires nothing more than this Court's explanation of its prior "incremental impacts" analysis – *i.e.*, its "findings supporting" and "analysis" of (1) the "*after*" situation under the "residential development" portions of [the 2040 Plan] *vis-à-vis* (2) the "*before*" situation under the "residential development portions of the [2030 Plan], and the pre-December 4, 2018 land use ordinances which implement the same residential development portions of the 2030 Plan."

In other words, Smart Growth asserted that the scope of the district court's analysis was limited to comparing what *had happened* under the 2030 Plan to the full build-out scenario under the 2040 Plan.

10

In response, the city filed a memorandum requesting that the district court deny Smart Growth's motion to reinstate the injunctive relief. The city argued that Smart Growth had presented no evidence of what a full build-out under the 2030 Plan would entail and that "[i]n the absence of a full build-out analysis under the 2030 Plan, the injunction automatically fails because there can be no factual finding that a full build-out under the 2040 Plan will cause more environmental harm than a full build-out under the 2030 Plan." The city also pointed to a declaration from one of its employees, Wesley Durham (the Durham Declaration), as providing the only analysis of a full build-out under the 2030 Plan—a "conservative estimate" of 700,000 additional housing units. The city finally argued that injunctive relief requiring reversion to the 2030 Plan would cause it unnecessary hardship by interfering with the environmental objectives of the 2040 Plan and creating conflicting obligations for the city, which was required to implement the 2040 Plan under the MLPA.

Smart Growth filed a reply in support of its motion and submitted a proposed order that required the city to cease implementing the 2040 Plan and revert to the 2030 Plan and corresponding ordinances. The city then submitted its own proposed order. The city reiterated its position that no injunction was required but acknowledged that summary judgment had been entered against it and proposed alternative terms in the event that the district court were to grant injunctive relief. The city represented that "[i]f an Order is issued in the form and substance as proposed below, . . . it does not intend to appeal that Order." The city's alternative proposed relief was for the court to enjoin the city from "issuing permits for development exceeding 100,000 new residential dwelling units in the

11

land area designated as Urban Neighborhood in the 2030 Plan between the dates January 1, 2020, and December 31, 2039."

The district court held a hearing in June 2023 and issued the amended injunction order on September 5, 2023. In the amended injunction order, the district court recited the procedural history of the case and reiterated its summary-judgment determinations that Smart Growth had established, through the Pauly Report, a prima facie case under MERA and that the city had failed to rebut the prima facie case or prove an affirmative defense. The district court determined that the record on remand should be limited to the evidence presented at the time the parties filed their cross-motions for summary judgment. The district court found that, "[b]ased on the record presented, anything short of [an injunction] of the ongoing implementation of the residential development portions of the 2040 Plan would be inadequate to safeguard the environment, which the legislature has determined to be of paramount concern."[4] And the district court found that "the record is sufficient to establish that a full build-out of the 2030 Plan, which has not been demonstrated to present

---

[4] The district court characterized the amended injunction order as granting a temporary injunction. A temporary injunction is granted "before a trial on the merits" when a defendant's "liability has not yet been determined." *DSCC v. Simon*, 950 N.W.2d 280, 286 (Minn. 2020) (quotation omitted); *see also Pickerign v. Pasco Mktg., Inc.*, 228 N.W.2d 562, 564 (Minn. 1975) ("The granting of a temporary injunction serves only to maintain the status quo until the case can be decided on the merits."). In this case, the district court determined liability on summary judgment and granted injunctive relief, the duration of which is not tied to resolution of the case on the merits. This is a permanent injunction. *See Black's Law Dictionary* 938 (11th ed. 2019) (defining a permanent injunction as one "granted after a final hearing on the merits" and noting that "[d]espite its name, a permanent injunction does not necessarily last forever"); *cf. Wadena Implement Co. v. Deere & Co., Inc.*, 480 N.W.2d 383, 386, 388-89 (Minn. App. 1992) (affirming a district court's grant of permanent injunctive relief under a statute following summary judgment), *rev. denied* (Minn. Mar. 26, 1992).

12

any risk to the environment, would cause fewer environmental effects than would a full build-out under the 2040 Plan."

The district court addressed, and rejected, the city's argument that the "equitable relief must be based on the same full implementation presumption" underlying its liability determination. The district court acknowledged that "the Court of Appeals found this argument . . . persuasive" but stated that it was "less swayed after considering it on remand." The district court also disagreed with the city's arguments regarding unnecessary hardship, reasoning in part that the city's harm of conflicting legal obligations was self-inflicted because, despite knowledge of Smart Growth's allegations, the city took no steps to amend the 2040 Plan or conduct environmental review during the pendency of the litigation.

Under the amended injunction order, the city was "immediately enjoined from any ongoing implementation of the residential development portions of the" 2040 Plan "unless and until the city has completed an appropriate and properly conducted EIS [(environmental-impact statement)] or AUAR [(alternative urban areawide review)]." And the city was required within 60 days to "restore the *status quo ante* . . . as it existed on December 4, 2018," by reverting to the residential development portions of the 2030 Plan and corresponding land use ordinances. The amended injunction order required Smart Growth to pay a $10,000 bond and provided that it will "expire on December 31, 2028, unless modified or vacated."

The city appeals.

13

I. Did the district court abuse its discretion in issuing the amended injunction order?

**ANALYSIS**

The city challenges the amended injunction order by asserting that the district court failed to comply with our instructions on remand and that the district court abused its discretion in granting injunctive relief under MERA. Below, we address each of the city's arguments in turn.

**I. The district court abused its discretion in issuing the amended injunction order.**

**A. The district court did not fail to comply with our remand instructions.**

"On remand, a district court must execute an appellate court's mandate strictly according to its terms and lacks power to alter, amend or modify that mandate." *Johnson v. Princeton Pub. Utils.*, 899 N.W.2d 860, 868 (Minn. App. 2017) (quotation omitted), *rev. denied* (Minn. Aug. 15, 2017); *see also Halverson v. Village of Deerwood*, 322 N.W.2d 761, 766 (Minn. 1982). But "[w]hen the [district] court receives no specific directions as to how it should proceed in fulfilling the remanding court's order, the [district] court has discretion . . . to proceed in any manner not inconsistent with the remand order." *Duffey v. Duffey*, 432 N.W.2d 473, 476 (Minn. App. 1988) (citing *John Wright & Assocs., Inc. v. City of Red Wing*, 97 N.W.2d 432, 434 (Minn. 1959)). "Appellate courts review a district court's compliance with remand instructions under the deferential abuse of discretion standard." *Janssen v. Best & Flanagan, LLP*, 704 N.W.2d 759, 763 (Minn. 2005).

Here, our remand instructions to the district court were not specific. We remanded the matter "for additional proceedings on [Smart Growth's] request for injunctive relief." *Smart Growth II*, 2022 WL 17957328, at *7. The district court had discretion to proceed in any manner not inconsistent with those general instructions. *See Duffey*, 432 N.W.2d at 476.

The city argues that the district court contravened our remand instructions in two ways. The city first argues that the district court failed to comply with the remand instructions by failing to conduct a full-build-out analysis of the 2030 Plan. This argument conflates our analysis in reversing the injunction with our remand instructions. We recognized the city's contention regarding the full build-out of the 2030 Plan in concluding that the district court ordered the city to revert to the 2030 Plan without findings on the necessity and scope of relief. *See Smart Growth II*, 2022 WL 17957328, at *6-7. But we did not direct the district court to undertake any particular analysis on remand. *Id.* at *7. Thus, we are not persuaded by the city's argument that the district court failed to comply with our remand instructions in this regard.[5]

The city also asserts that the district court contravened our remand instructions by "clos[ing] the record on remand despite [this court's] specific direction to conduct 'additional proceedings.'" The city argues that "[t]he direction to conduct 'additional proceedings' is broader than a remand to merely issue findings of fact on the existing

[5] In section I.B.2, below, we address a separate question: whether the district court abused its discretion in requiring the city to revert to the 2030 Plan without evidence that reversion to that plan is necessary and appropriate to protect the environment pursuant to Minnesota Statutes section 116B.07.

15

record." We disagree. The district court conducted "additional proceedings" by accepting written submissions from the parties and holding a hearing before issuing an amended injunction order. *See, e.g.*, *The American Heritage Dictionary of the English Language* 1404 (5th ed. 2018) (defining "proceedings" as "[t]he activities and hearings of a legal body"). Because our remand instructions did not require the district court to reopen the record, the district court had the discretion to reopen it, or not. Accordingly, we reject the city's contention that the district court failed to comply with our remand for additional proceedings on Smart Growth's request for injunctive relief.

Having concluded that the city's arguments for reversal based on our remand instructions are unavailing, we next turn to the city's substantive challenges to the amended injunction order.

**B.      The district court abused its discretion in granting injunctive relief under MERA.**

"The conditions that must be met to grant a statutory injunction are determined by the text of the statute authorizing the injunction." *State v. Minn. Sch. of Bus., Inc.*, 899 N.W.2d 467, 471-72 (Minn. 2017). Under MERA, a district court "may grant declaratory relief, temporary and permanent equitable relief, or may impose such conditions upon a party as are necessary or appropriate to protect the air, water, land or other natural resources located within the state from pollution, impairment, or destruction." Minn. Stat. § 116B.07. "The relief available under MERA is broad in scope." *Smart Growth I*, 954 N.W.2d at 590. "A [district] court may issue an injunction that 'provides an adequate remedy without imposing unnecessary hardship on the enjoined party.'" *State ex rel. Wacouta Twp. v.*

16

*Brunkow Hardwood Corp.*, 510 N.W.2d 27, 31 (Minn. App. 1993) (quoting *Cherne Indus., Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81, 93 n.6 (Minn. 1979)). The district court's decision to award injunctive relief under MERA is "an exercise of its equitable powers" that will be reversed "only if the district court abuses its discretion." *State ex rel. Swan Lake Area Wildlife Ass'n v. Nicollet Cnty. Bd. of Cnty. Comm'rs*, 799 N.W.2d 619, 624-25 (Minn. App. 2011) (*Swan Lake III*). "A district court abuses its discretion if its decision is against the facts in the record or if its ruling is based on an erroneous view of the law." *Id.* (quotations omitted).

Smart Growth prevailed at summary judgment by relying on the Pauly Report to demonstrate that a full build-out of the 2040 Plan was likely to materially adversely affect the environment. *See* Minn. Stat. § 116B.04(b). But Smart Growth's success at summary judgment in showing that a full build-out constitutes a MERA *violation* did not answer the question of what MERA *relief* was "necessary or appropriate to protect" the environment. Minn. Stat. § 116B.07. That question was for the district court to determine in the exercise of its equitable powers. *See id.*; *Swan Lake III*, 799 N.W.2d at 625-26. The city argues that the district court abused its discretion in issuing the amended injunction order because: (1) the district court erred by assigning the burden of proof to the city in determining whether to grant injunctive relief; (2) the record does not support the district court's finding that reverting to the 2030 Plan would cause less environmental harm; and (3) the relief causes unnecessary hardship to the city. We analyze each contention seriatim.

17

**1.   The district court erred by shifting the burden of proof to the city in deciding whether to grant the amended injunction order.**

A plaintiff carries the burden of proof to establish a basis for requested injunctive relief. *See AMF Pinspotters, Inc. v. Harkins Bowling, Inc.*, 110 N.W.2d 348, 351 (Minn. 1961); *see also Wadena*, 480 N.W.2d at 389 (explaining that "where injunctive relief is explicitly authorized by statute . . . proper exercise of discretion requires the issuance of an injunction if the prerequisites for the remedy *have been demonstrated* and the injunction would fulfill the legislative purposes behind the statute's enactment" (emphasis added)). And "[a]bsence of proof on a vital issue loses the case for the party having the burden of proof." *McGerty v. Nortz*, 254 N.W. 601, 602 (Minn. 1934), *cited in State v. Curtis*, 921 N.W.2d 342, 348 (Minn. 2018); *see also Howard v. Marchildon*, 37 N.W.2d 833, 836 (Minn. 1949) ("Where a party having the burden of proof with respect to a particular issue fails to sustain such burden, decision as to such issue must go against him."); *Maher v. Duluth Yellow Cab Co.*, 215 N.W. 678, 679 (Minn. 1927) (explaining that "the burden of proof is with the affirmative" and "[t]he negative prevails automatically without evidence either way").

The city argues that the district court erred by assigning the city the burden of proof in determining whether to grant injunctive relief. We agree. Repeatedly in its order, the district court faulted the city for the lack of evidence in the record regarding the environmental impacts of the 2030 Plan. The district court determined that this lack of evidence supported granting the injunctive relief sought by Smart Growth: reversion to the 2030 Plan. The district court also declined to accept the city's arguments about the lack of

18

evidence supporting reversion to the 2030 Plan, characterizing those contentions as raising "metaphysical concerns." Effectively, then, rather than require Smart Growth to prove that reversion to the 2030 Plan *was* "necessary or appropriate" to protect the environment, *see* Minn. Stat. § 116B.07, the district court required the city to prove that it *was not*. In so requiring, the district court turned the burden of proof on its head, expressly evincing this burden shift by setting forth alternative reasoning that the record would support injunctive relief "[e]ven if the city does not have the burden of proof at this stage."[6]

The district court's analysis suggests that it was appropriate for the city to bear the burden of proof as to injunctive relief because the city's arguments against reverting to the 2030 Plan were "no different than asserting the affirmative defense that 'there was no feasible prudent alternative,' an issue on which the city would bear the burden of proof." We disagree with the parallel that the district court sought to draw.

It is true that, to prevail on an affirmative defense to a plaintiff's prima facie showing of a MERA violation, a defendant must show both "that there is no feasible and prudent alternative" and that "the conduct at issue is consistent with and reasonably required for promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its air, water, land and other natural resources from pollution, impairment, or destruction." Minn. Stat. § 116B.04(b). Accordingly, to defeat Smart Growth's prima facie showing by way of an affirmative defense, the city would have had

---

[6] We address whether the record supports the injunctive relief in section I.B.2, below.

to prove that there was no feasible and prudent alternative to the 2040 Plan. As the district court observed, the city did not try to prove this affirmative defense.

But the city's failure to prove such an affirmative defense is not at issue in this appeal because the district court determined in 2022 that the city had committed a MERA violation when it granted summary judgment in Smart Growth's favor, and we affirmed that determination in *Smart Growth II*, 2022 WL 17957328, at *4, *6. *See Swan Lake III*, 799 N.W.2d at 631 ("Affirmative defenses are not at issue in this appeal because the district court concluded in 2007 that the county had committed a MERA violation, and we affirmed that conclusion in [*State ex rel. Swan Lake Area Wildlife Ass'n v. Nicollet Cnty. Bd. of Cnty. Comm'rs*, 771 N.W.2d 529, 538 (Minn. App. 2009) (*Swan Lake II*)]."). The city's burden of proving an affirmative defense to Smart Growth's prima facie showing of a MERA violation under Minnesota Statutes section 116B.04(b) is inapposite to whether Smart Growth is entitled to injunctive relief under section 116B.07. *See id.* (distinguishing between "a defendant's burden of proof on affirmative defenses to a MERA claim" and the separate analysis for "determining an appropriate remedy for a MERA violation").

Instead, as Smart Growth conceded at oral argument, to prevail on a request for injunctive relief under MERA following a grant of summary judgment, a plaintiff must demonstrate: (1) that the requested relief is "necessary or appropriate to protect the air, water, land or other natural resources located within the state from pollution, impairment, or destruction," Minn. Stat. § 116B.07; and (2) that the requested relief "provides an adequate remedy without imposing unnecessary hardship on the enjoined party," *Wacouta Twp.*, 510 N.W.2d at 31 (quotation omitted). *See also AMF Pinspotters*, 110 N.W.2d at

20

351 ("Injunctive relief should be awarded only in clear cases, reasonably free from doubt, and when necessary to prevent great and irreparable injury. The burden of proof rests upon the complainant to establish the material allegations entitling him to relief."). As noted above, the determination of whether the requested relief is necessary or appropriate per Minnesota Statutes section 116B.07 is necessarily distinct from a determination pursuant to section 116B.04(b) that there is no feasible or prudent alternative to the conduct challenged under MERA. *See Swan Lake III*, 799 N.W.2d at 631. The city's failure to pursue an affirmative defense to Smart Growth's prima facie showing of a MERA violation did not relieve Smart Growth of its burden of proving that the requested injunctive relief is necessary or appropriate to protect the environment and will not impose unnecessary hardship on the city. *See AMF Pinspotters*, 110 N.W.2d at 351. Nor did it shift to the city the burden of proving the converse.

We therefore hold that a party seeking injunctive relief under MERA has the burden of demonstrating that the requested injunctive relief is necessary or appropriate to protect the environment and will not impose unnecessary hardship on the enjoined party. Because the district court incorrectly assigned the burden of proof to the city in deciding whether to grant Smart Growth's requested relief, we conclude that the amended injunction order is based on an erroneous view of the law and that the district court therefore abused its discretion. *See Swan Lake III*, 799 N.W.2d at 625.

**2.    The record does not support the district court's finding that reversion to the 2030 Plan is necessary or appropriate to protect the environment.**

"In reviewing a grant of injunctive relief, we may not set aside the [district] court's findings of fact unless they are clearly erroneous." *City of Ramsey v. Amusement Ctr., Inc.*, 498 N.W.2d 25, 28 (Minn. App. 1993) (citing *Cherne*, 278 N.W.2d at 88). "[F]indings are clearly erroneous when they are manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021) (quotation omitted). We must view the evidence in the light most favorable to the district court's findings, and we cannot conclude that the district court erred "unless, on the entire evidence, we are left with a definite and firm conviction that a mistake has been committed." *Id.* (quotations omitted). Our duty is not to reweigh evidence, but to "review . . . the record to confirm that evidence exists to support the decision." *Id.* at 222. In applying this standard, however, we are not required to "ignore the nature of the evidence," nor may a "factfinder base findings entirely on unreliable evidence." *Id.*

In determining that it was necessary or appropriate to completely enjoin the residential development portions of the 2040 Plan and deciding to grant injunctive relief, the district court found that "the record is sufficient to establish that a full build-out of the 2030 Plan, which has not been demonstrated to present any risk to the environment, would cause fewer environmental effects than would a full build-out under the 2040 Plan." The city argues that "[t]he absence of evidence is not evidence" and that the record does not

22

support a finding that reversion to the 2030 Plan will be better for the environment. We agree.

In support of its finding that reversion to the 2030 Plan would cause fewer environmental effects, the district court relied heavily on the absence of a legal challenge to the 2030 Plan while it was in place. The district court reasoned that "[t]he record is devoid of any evidence of any environmental challenges made to any of the pre-December 7, 2018, land-use ordinances which implemented the residential development portions of the 2030 Plan." We conclude that the lack of a lawsuit challenging the 2030 Plan is not reliable evidence that reverting to that plan will be less environmentally harmful than proceeding under the 2040 Plan.

The district court also relied on a declaration from Alissa Pier (the Pier Declaration), a former city employee who "review[ed] and quantif[ied] land use applications in relation to the 2040 Plan." The district court determined that Pier's "observations allow the court to make further findings bearing on the comparison of the 2040 Plan and the 2030 Plan." Those observations included that, "since the . . . 2040 Plan took effect on January 1, 2020, there has been a significant increase in total approved building height, linear feet, gross area footprint, and impermeable surface coverage." But Pier does not connect her observations about projects approved under the 2040 Plan to any anticipated environmental harms, much less explain how those harms would not occur under the 2030 Plan. Notably, the district court declined to rely on the Durham Declaration—which estimated that a full build-out of the 2030 Plan would conservatively result in 700,000 additional dwelling units—because Durham "did not make any assertions whatsoever that relate to

23

environmental impact." For the same reasons, we conclude that the Pier Declaration is not reliable evidence that reverting to the 2030 Plan will be less environmentally harmful than proceeding under the 2040 Plan.

In addition, the district court relied on its own analysis of the language of the 2030 Plan in comparison to the 2040 Plan. The district court cited short excerpts from the 288-page 2030 Plan to reason that "its goal was to preserve existing housing stock." But, as the city points out, the 2030 Plan also expressed a goal of "allowing for increased density in order to attract and retain long-term residents and businesses." We conclude that the language of the comprehensive plans, without more, is not reliable evidence that reverting to the 2030 Plan will be less environmentally harmful than proceeding under the 2040 Plan.

The district court cites no other evidence to support its finding that reversion to the 2030 Plan will be better for the environment.[7] Indeed, as discussed in section I.B.1, the thrust of the district court's analysis is that the record *lacks evidence* related to the environmental impacts of the 2030 Plan, which the district court found persuasive in Smart

---

[7] Our conclusion regarding the dearth of record evidence includes consideration of the district court's reference to Minnesota Rule 4410.4400, subpart 14(D) (2021), for the fact that "[t]he 2040 Plan's provision for nearly 150,000 new residential units is 100 times more than the minimum number of new unattached residential units and 150 times more than the minimum number of new attached residential units that trigger a mandatory" EIS under MEPA. The plain language of subpart 14(D) restricts its scope to "contiguous land owned by the proposer or for which the proposer has an option to purchase . . . ." *See* Minn. R. 4410.4400, subp. 14(D). But there is no evidence in the record to support a conclusion that the "nearly 150,000 new residential units" possible under the 2040 Plan would be on contiguous land owned by a single proposer or for which a single proposer would have an option to buy. More critically, the district court's analysis included no comparable discussion of the 2030 Plan, which the Durham Declaration estimated would likewise lead to development at full build-out many times the minimum that would trigger a mandatory EIS under MEPA.

Growth's favor because the district court had shifted the burden of proof to the city. The district court explicitly set forth this reasoning by stating that, "[w]hile it can be argued that the absence of evidence does not establish the contrary, it is nevertheless also true that the absence of evidence of this nature provides absolutely no support for the city's suggestion that its own 2030 Plan might be more harmful to the environment than the 2040 Plan that it adopted." And although summary judgment in favor of Smart Growth's MERA claim was based on the theory that a full build-out of the 2040 Plan would materially adversely affect the environment, *see Smart Growth II*, 2022 WL 17957328, at *2, the district court also noted during this litigation that there is no evidence of environmental harm resulting from the 2040 Plan while it was in effect. At bottom, there is no serious dispute that the record lacks evidence to support a finding that reversion to the 2030 Plan would be better for the environment than ongoing implementation of the 2040 Plan.

Thus, viewing the evidence in the light most favorable to the district court's finding that anything less than a complete injunction against ongoing implementation of the residential development portions of the 2040 Plan would be inadequate to safeguard the environment, we are left with a definite and firm conviction that a mistake has been committed because that finding is not reasonably supported by the evidence as a whole. *See Kenney*, 963 N.W.2d at 221. The district court's finding—that reversion to the 2030 Plan would cause fewer environmental effects—is clearly erroneous. *See id.*

Because the district court clearly erred in finding that reversion to the 2030 Plan is necessary or appropriate to protect the environment, we conclude that the amended

injunction order is against the facts in the record and therefore an abuse of discretion. *See Swan Lake III*, 799 N.W.2d at 625.

### 3. The district court abused its discretion by ordering relief that causes unnecessary hardship to the city.

"When determining an appropriate remedy for a MERA violation, a district court is required to balance the environmental concerns that MERA seeks to protect against the effects on the enjoined party to ensure that the remedy does not impose unnecessary hardship on the enjoined party." *Id.* at 631 (quotation omitted). The district court found that "anything short of [an injunction] of the ongoing implementation of the residential development portions of the 2040 Plan would be inadequate to safeguard the environment, which the legislature has determined to be of paramount concern." And the district court did not accept the city's assertion that it would suffer unnecessary hardship if forced to revert to the 2030 Plan in violation of its obligations under the MLPA. The city argues that the relief ordered by the district court in the amended injunction order causes the city unnecessary hardship. Here, again, we agree.

The city asserts that the district court's injunction forces it to be out of compliance with its obligations under the MLPA and disrupts regional planning, resulting in unnecessary hardship. Amicus curiae Metropolitan Council corroborates the city's assertion.[8] The Metropolitan Council explains that the city's adoption of the 2040 Plan was

---

[8] In support of this argument, the city submitted with its reply brief a supplemental addendum containing a November 21, 2023 letter from the Metropolitan Council to the city. Smart Growth moved to strike the supplemental addendum and references to the letter in the city's reply brief. We agree with Smart Growth that the letter, sent after the district court issued the amended injunction order, is not part of the record and should not be

26

part of broader regional planning under the MLPA and that reinstating the 2030 Plan would require submission of an amendment to the Metropolitan Council for review. Moreover, reinstating the residential development portions of the 2030 Plan is "not as simple as pulling out a chapter of a book and replacing it," but would "require the city to review and seek amendments to nearly every portion of its comprehensive plan." And, the Metropolitan Council concludes: "If the city attempted to amend its 2040 Plan without Council review, it would be in direct violation of the MLPA."

Both the city and the Metropolitan Council propose alternative forms of injunctive relief that would avoid the hardship imposed by the amended injunction order. As the city explains, the environmental harms identified in the Pauly Report stem from her estimation that the increased density allowed under the 2040 Plan would permit nearly 150,000 additional housing units. With this in mind, the city proposed to the district court injunctive relief that would allow it to continue implementing the 2040 Plan, but with a cap on the number of housing units that could be approved. The Metropolitan Council likewise suggests a cap on residential development—which it asserts could be as low as 21,800— that would still allow the city to comply with its obligations under the 2040 Plan and to avoid disrupting regional planning for expected population growth. The Metropolitan Council also suggests that the district court could, consistent with the MLPA, impose a

considered by this court in determining whether the district court abused its discretion in fashioning injunctive relief. *See* Minn. R. Civ. App. P. 110.01. We have not considered the letter in reaching our decision, and we deny the motion to strike as moot. *See Drewitz v. Motorwerks, Inc.*, 728 N.W.2d 231, 233 n.2 (Minn. 2007) (denying a motion to strike as moot when the supreme court did not rely on contested documents in reaching its decision).

one-year moratorium on development in the residential areas from which Smart Growth asserts the environmental harms of the 2040 Plan will emanate.

The district court acknowledged that the amended injunction order would create hardship for the city but stated that it "cannot find . . . that this hardship is unnecessary," noting "that courts around the country have held that a party's, including a governmental party's, self-inflicted harm should not be considered in conducting the balance of harms analysis required for the issuance of [an injunction]." The city, the district court reasoned, had been aware of the allegations in Smart Growth's lawsuit since shortly before it adopted the 2040 Plan in 2018, and had taken no steps to amend the plan or to conduct environmental review during the pendency of the litigation.

Although caselaw has not defined the nature of unnecessary hardship in the context of a MERA claim, it follows from the plain language of the statute that, at a minimum, injunctive relief poses *unnecessary* hardship when it is not *necessary* to protect the environment. *See* Minn. Stat. § 116B.07. As explained above in section I.B.2, the record lacks evidence to support the district court's finding that reversion to the 2030 Plan is necessary to protect the environment. And we are persuaded that the proposed alternative injunctive remedies offered by the city and the Metropolitan Council further undermine the district court's finding that reversion is necessary.

Moreover, caselaw supports the city's argument that, on this record, the district court abused its discretion by requiring the city to choose compliance with either of two statutory schemes. In *Smart Growth I*, the supreme court acknowledged the city's concerns about complying with the MLPA and concluded that "[t]he provisions of the MLPA and

28

MERA are not in conflict with one another and can, therefore, be given full effect." 954 N.W.2d at 593 n.11. And in *Swan Lake III*, this court noted with approval that the "district court's award of equitable relief achieved harmony between and among" various statutory requirements, thereby complying with the "general policy of statutory construction . . . of harmonizing statutes dealing with the same subject matter." 799 N.W.2d at 628 (alteration in original) (quoting *People for Env't Enlightenment and Resp. (PEER), Inc. v. Minn. Env't Quality Council*, 266 N.W.2d 858, 866 (Minn. 1978)). Conversely, based on the facts before us, we conclude that the district court abused its discretion in fashioning injunctive relief that forces the city out of compliance with the MLPA.

Smart Growth nonetheless urges that reversion to the 2030 Plan is required because (1) the supreme court has already "sanctioned" Smart Growth's requested remedy of environmental review of the 2040 Plan, and (2) under MEPA, an EIS or AUAR must precede project commencement. *See* Minn. Stat. § 116D.04, subd. 2b; Minn. R. 4410.3100, subp. 2 (2021). This argument rests on two flawed premises. First, the supreme court in *Smart Growth I* did not sanction any particular remedy in this case. It merely held that Smart Growth was not precluded from seeking environmental review not required under MEPA as a remedy for its claim under MERA. *See Smart Growth I*, 954 N.W.2d at 586, 593. Second, the supreme court made clear in *Smart Growth I* that the requirements of MEPA do not apply to an action under MERA. *Id.* at 591. Indeed, the supreme court accepted Smart Growth's contention that an administrative rule exempting comprehensive plans from environmental review under MEPA "[could] only apply to the act under which it was promulgated." *Id.* For these reasons, we are unconvinced by Smart Growth's

29

argument that reversion to the 2030 Plan is required by the supreme court's decision in *Smart Growth I*.

In sum, we conclude that the district court abused its discretion by fashioning injunctive relief that causes unnecessary hardship to the city.

## CONCLUSION

In seeking injunctive relief under MERA, Smart Growth bore the burden of demonstrating that its requested relief was necessary or appropriate to protect the environment and would not cause unnecessary hardship to the city. We conclude that the district court erred by assigning the burden of proof to the city in determining whether to grant injunctive relief, clearly erred by finding that reversion to the 2030 Plan was necessary or appropriate to protect the environment, and abused its discretion in fashioning injunctive relief that imposes unnecessary hardship on the city. We therefore reverse the amended injunction order.

In reaching these conclusions, we acknowledge the protracted nature of this litigation, the important interests at stake, and that "[t]he relief available under MERA is broad in scope." *Smart Growth I*, 954 N.W.2d at 590. Nothing in this opinion shall be construed to preclude further proceedings before the district court under Minnesota Statutes section 116B.07, either for different relief or for the same relief based on a more developed record. We merely hold that, on the record before it, the district court abused its discretion by granting the amended injunction order.

**Reversed; motion denied.**